**UNITED STATES v. KESSLER.**
**No. 10780.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 2, 1952.
Reargued Dec. 22, 1953.
May 13, 1954.

Lois G. Forer, Philadelphia, Pa. (Wm. J. Woolston, Philadelphia, Pa., on the brief), for appellant.

G. Clinton Fogwell, Jr., Asst. U. S. Atty., Philadelphia, Pa. (W. Wilson White and Gerald A. Gleeson, U. S. Attys., Joseph G. Hildenberger, Asst. U. S. Atty., William B. Taffet, Dist. Counsel, Immigration and Naturalization Service, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

The proceeding at bar was brought in the court below in January 1950 to cancel the certificate of naturalization issued by that court in 1932 to Reba Kessler, born Revke Kisilevsky, in Chmelnick, Russia, in 1893, she having emigrated to Philadelphia in 1909. The law in effect at the time of Kessler's naturalization was the "Basic Naturalization Statute", 34 Stat. 596 as amended and supplemented by the Act of March 2, 1929, 45 Stat. 1512.

The complaint for denaturalization alleged that Kessler in her petition for naturalization filed in 1931 represented that she had never been arrested.[1] Kessler in her answer denied that she had answered " 'That she had never been arrested' ", but went on to stay that in her petition for naturalization " * * * she was asked, among other things, 'Have you ever been arrested or charged with the violation of any law of the United States or State or any city, ordinance or traffic regulation', and that she * * * answered 'No.' to this ques-

---

[1]. This was not literally true. The question "Have you ever been arrested * * *?" was asked of Kessler on her "Application for Certificate of Arrival and Preliminary Form for Petition for Citizenship" and her answer "No." was given on this form. The variance is immaterial, however, for Section 4 (Second) of the Act, 34 Stat. 597, provides, "At the time of filing his petition there shall be filed with the clerk of the court a certificato from the Department of * * * Labor, if the petitioner arrives in the United States after the passage of this Act [of June 29, 1906], stating the date, place, and manner of his arrival in the United States, and the declaration of intention of such petitioner, which certificate and declaration shall be attached to and made a part of said petition."

tion." The complaint for denaturalization also alleged that the court below, relying on the truth and good faith of Kessler's reports made in her petition for naturalization, entered its order admitting her to citizenship of the United States and issued a Certificate of Naturalization. In her answer Kessler admitted the truth of these allegations. The complaint further alleged that Kessler had been "arrested" seventeen times between June 4, 1929 and February 19, 1930 in Philadelphia, charged with "Obstructing highway", and that each time she was "Discharged" by Magistrate Fitzgerald of Philadelphia. To these allegations the following answer was made: "The defendant admits that between June 4, 1929 and February 19, 1930 she had been arrested at the times and places and on the charges set forth in * * * the complaint. She denies that her * * * representations were false and fraudulent * * *".

Thereafter in her answer Kessler asserted a series of defenses the substance of which was that she had not violated any law of the United States or of the Commonwealth of Pennsylvania or a city ordinance or traffic regulation; that when she was arrested for "Obstructing highway" she did not consider herself as having been arrested or charged with a violation of any law, ordinance or traffic regulation and that therefore her answer to question 29 [2] was correctly in the negative and was made in good faith.

At the trial Kessler testified in pertinent part that she answered "No" to Question 29 because she understood that she was "freed on the arrest, so * * * I didn't commit any crime or anything. I didn't do anything wrong, and that is why * * * I answered 'No'. I didn't mean to lie. I didn't have any intention to say anything that * * * wasn't true, but that was what I understood. I didn't understand at that time * * *". In respect to these defenses the court below found (1) that Kessler's arrests were based on a charge which constituted an indictable offense, viz., a "breach of the peace" and that Kessler had been legally arrested; and (2) that the United States had to prove not only that her answer was false but had been made "with knowledge of falsity and in a willful and deliberate attempt to deceive the Government as to a material fact in the naturalization process." See 104 F. Supp. at pages 437–438.

As stated the court below found that Kessler had committed a "breach of the peace" and that this was

---

2. A question about the arrest record of an applicant for citizenship first appeared as question number 29 on a preliminary form for petition for citizenship on July 1, 1929. Its wording was: "Have you ever been arrested or charged with the violation of any law of the United States or State or any city ordinance or traffic regulation? If so, give full particulars." The wording of the question remained the same (though its number was changed) until July 15, 1943, when the second sentence of the question was amended to read: "If so, give date, place and cause of arrest and disposition of each case." The next change in wording was effective on September 6, 1949, when the following was adopted: "Have you, either in the United States or in any other country, been arrested, charged with violation of any law or ordinance, summoned into court as a defendant, convicted, fined, imprisoned, or placed on pro-

bation or parole, or forfeited collateral for any act involving a felony, misdemeanor, or breach of any public law or ordinance? If so, give date, place, offense and disposition. * * *"

The present form of the question has been in use since September 25, 1951, and is as follows: "Have you ever, in the United States or in any other country, been arrested, charged with violation of any law or ordinance, summoned into court as a defendant, convicted, fined, imprisoned, or placed on probation or parole, or forfeited collateral for any act involving a felony, misdemeanor, or breach of any public law or ordinance? Yes [ ] No [ ] If 'Yes' give the following information for every case. If necessary continue this list on another sheet of paper.

When, Where (City) (State) (Country) Offense Involved Outcome of case."

an indictable offense in 1929 and 1930. We cannot concur in this ruling. The United States is bound upon the record made by the entries in the magistrate's docket which we have quoted above and there was no such offense as "Obstructing highway".[3] Of course, Kessler could have been legally arrested for a breach of the peace, committed in the presence of the arresting peace officer. Commonwealth v. Rubin, 1923, 82 Pa. Super. 315; see Commonwealth ex rel. v. Bowman, 1904, 29 Pa.Co.Ct.R. 635, 636; Commonwealth v. Doe, 1933, 109 Pa.Super. 187, 189, 167 A. 241, 242. Cf. Pa. Act of April 20, 1869, P.L. 1187, 53 P.S. Pa. § 6858; Commonwealth v. Lucas, 1921, 30 Pa.Dist. 963. A breach of the peace is "a disturbance of public order by an act of violence or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community." Commonwealth v. Sherman, 1930, 14 Pa. Dist. & Co.R. 4, 12. Obstructing the highway with violence or threat of violence would constitute a breach of the peace and this would constitute an offense for which Kessler could have been legally arrested. But there is no evidence or even a suggestion that the picketing or the obstructing of the highway took place with violence or the threat of it. Indeed all of the evidence looks the other way. Compare the crime of "disorderly conduct". See the Act of June 25, 1895, P.L. 271, as amended by the Act of May 2, 1901, P.L. 132, and compare the annotations in 18 P.S.Pa. § 4406. But one cannot claim that a person was arrested for "Obstructing highway", a crime then, and probably now, unknown to the law of Pennsylvania, and assert that the arrest was one made in accordance with law.[4] We therefore disagree with the ruling of the court below that the arrests were legal and valid. See 104 F.Supp. at page 437. As a matter of law they were illegal and invalid. They were at best "false arrests",[5] Meyers v. Tygh, 1920, 75 Pa.Super. 271, 272, and as a matter of law Kessler was subjected to "false imprisonments."[6]

3. Kessler testified that she was engaged from time to time in peacefully picketing the plant at which she worked which had been struck; that from time to time the police would arrest the persons constituting the picket line and bystanders, and that sometimes she was arrested as a picket and sometimes as a bystander. Peaceful picketing for a proper purpose is permitted under the law of Pennsylvania. See Kirmse v. Adler, 1933, 311 Pa. 78, 88, 166 A. 566, 570; Wortex Mills, Inc., v. Textile Workers Union of America, C.I.O., 1952, 369 Pa. 359, 363, 85 A.2d 851, 854.

4. Kessler concedes that her "arrests" were made by uniformed officers of the Philadelphia City Police Force and that at least on some occasions she and her fellow pickets or bystanders were taken before the magistrate in a patrol wagon. Certainly the outward indicia of arrest by competent authority were present. But this is not enough for the reasons stated in this opinion.

5. An element most frequently found in definitions of arrest is a holding of the individual to answer to some alleged or suspected crime. Ex parte Sherwood, 1890, 29 Tex.App. 334, 336, 15 S.W. 812, 813; Davis & Allcott Co. v. Boozer, 1926, 215 Ala. 116, 110 So. 28, 49 A.L.R. 1307; State v. Beckendorf, 1932, 79 Utah 360, 10 P.2d 1073; People v. Marendi, 1915, 213 N.Y. 600, 608, 107 N.E. 1058, 1030. The Marendi case relied in part upon the definition of arrest in the New York Code of Criminal Procedure, to wit: ' * * * the taking of a person into custody that he may be held to answer for a crime.' § 167. Marendi was convicted of murder in the first degree while resisting arrest for a felony. A policeman had detained him only for the purpose of searching him. The New York Court of Appeals held in part that this was not an arrest within the statutory definition and a new trial was ordered. The definition of "arrest" in the proposed Uniform Arrest Act is almost identical with that of the New York statute quoted. See 28 Virginia L.Rev. 315, 344 (1942). The seventeen apprehendings of Kessler in which the police officers engaged were repeated tortious interferences with the liberty of the individual. Kessler's alleged crimes were not even supposed ones within People v. Marendi, supra.

6. See Baird v. Householder, 1858, 32 Pa. 168, 169, where a trespasser was ar-

Was it the intention of the framers of Question 29 to compel an applicant for citizenship to give information respecting "false arrests" as well as legal and valid arrests? The applicable regulation, Rule 1, Subdivision G, par. 2, is set out in the footnote [7] and it will be observed that the regulation requires examiners to cover thoroughly the question of "possible" arrests. The adjective "possible" seems to imply at least some regularity of procedure. It is frequently used in ordinary parlance as the equivalent of "permissible," as for example, to describe the conduct of an agent acting within the scope of his authority, express or implied.[8] The adjective clouds the regulation but we think it was not the intention of its framers to include false arrests within the term "possible arrests" and therefore within the scope of Question 29. To rule otherwise would be to treat the word "possible" under the circumstances of this case as the substantial equivalent of "false" or "invalid." It must also be pointed out, and this may be treated as dispositive of any question raised by the use of the term "possible" in the regulations, that the contents of the regulations, insofar as the record shows, were never brought to Kessler's attention.

rested on a criminal warrant, charging an act which was not a crime but simply a trespass. The Supreme Court of Pennsylvania stated: "As respects a criminal prosecution, therefore, the information and process were not only irregular, but void on the face of them, and all concerned in the arrest were, in law, trespassers."

In Hepworth v. Covey Bros. Amusement Co., 1939, 97 Utah 205, 210, 91 P.2d 507, 509, the Supreme Court of Utah stated: "We wish to invite attention to a distinction in the law which we believe has been confused in the briefs. False arrests may be committed only by one who has legal authority to arrest or who has pretended legal authority to arrest. False imprisonment may be committed by anyone who imprisons without legal right. One who commits a false arrest of another may be liable in damages for false imprisonment, but from this we must not reason that if there is a failure of proof of false arrest, of necessity there is a failure of proof of false imprisonment. False arrest is merely one means of committing a false imprisonment. False imprisonment may be committed without any thought of attempting an arrest.

" 'Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain or to go where he does not wish to go, is an imprisonment. * * * The essential thing is the restraint of the person. * * * If the words or conduct are such as to induce a reasonable apprehension of force, and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty as by prison bars.

* * * ' 11 R.C.L. 793, 794, sec. 5."
See also 35 C.J.S. False Imprisonment, § 5, pp. 505–506.

7. Instructions to naturalization examiners, requiring them to ask specific questions about the applicant's arrest record, first appeared in the Naturalization Regulations of the Department of Labor dated July 1, 1929, and are still in effect. See Code of Federal Regulations, 1938 Edition, Title 8 § 70.7; 8 CFR (1952 ed.) § 1.2 (saving clause). The pertinent portions of the regulations read: "The question of possible arrests must be thoroughly covered. If the applicant has been arrested or charged with the violation of any law or ordinance, all the facts will be ascertained, including information as to whether conviction resulted."

8. Webster's New International Dictionary, 2d ed., as its first definition gives the following: "Within the powers of performance, attainment, conception, etc., of an agent or activity expressed or implied; within or up to the limits of one's ability or capacity as determined by nature, authority, circumstances, etc.; sometimes, loosely, permissible, conceivable; attainable; as knowledge *possible* only to God; a cure is *possible;* as curt as it was *possible* to be; not *possible* to see the patient today; the highest *possible* number." Webster gives as synonyms: "Possible, practicable, feasible." Compare the exposition of the meaning of the adjective "feasible," in In re Philadelphia and Reading Coal & Iron Co., 3 Cir., 1939, 104 F.2d 126. The word "possible" also implies a contingency. See 72 C.J.S. p. 245, Webster's New Collegiate Dictionary, 1951 ed. See also In re Kenilworth Bldg. Corporation, 7 Cir., 1939, 105 F.2d 673, 676.

Indeed, the form of Question 29 as it existed at the time that it was presented to Kessler for answer, suggests a grammatical solecism rather than an intent on the part of the framers of the question to compel an applicant to answer as to whether or not he or she had ever been illegally arrested or subjected to false arrest. If the word "for" is inserted before the word "or" (first occurrence) in Question 29 the true intent of its framers would, we believe, have been adequately expressed. We think that a reading of the question by the ordinary individual, untrained in the niceties of the English language, as are many immigrants, would probably lead him to believe that the inquiry was directed to any arrest to answer for a crime or charge cognizable under the criminal law. Such is the precise basis for inquiry as to arrests used by the Immigration and Naturalization Service at the present time. See the question now employed as set out in the last paragraph of note 2, supra. We conclude that the Immigration and Naturalization Service did not intend to narrow its inquiry as to arrests by using the new present form of question employed since September 25, 1951. We are of the opinion that Kessler's asserted interpretation of the scope of the question was a reasonable one for she had been informed by Magistrate Fitzgerald seventeen times, and by counsel for her union on numerous occasions, that she had committed no crime cognizable at law. Certainly the answer which she gave in 1931 to Question 29 would be a truthful answer to the question as it exists today on every questionnaire employed by the Immigration and Naturalization Service. We can scarcely take the position that that which would constitute a truthful answer today was a lie in 1931.

We are also of the opinion that if the term "arrested" as used in Question 29 was intended to include a false or illegal arrest at least of the kind to which Kessler was subjected, the Immigration and Naturalization Service passed beyond the borders of its statutory authority. It was the intention of Congress in enacting the Naturalization Act of 1929, as it was in enacting the earlier and later Acts governing naturalization and immigration, to exact from the applicant for citizenship any information which would be pertinent to and shed light upon the moral character of the applicant. The "false arrest" to which Kessler was subjected affirmatively appears as false *as a matter of law* on the face of the record—the magistrate's docket—because the "arrest" was for a purported offense which had no existence in the law of Pennsylvania. The persons who made the "arrests" were mere trespassers. See Baird v. Householder, 1858, 32 Pa. 168, 169, discussed in note 6, supra. The apprehendings of Kessler, subjecting her to false or illegal detentions of the kind presently before us, cannot be deemed properly to throw light upon her moral character. The inquiry under the circumstances was too remote from the purpose of the statute to stand as valid.[9]

█ In conclusion we state that the complaint, as has been pointed out hereinbefore, alleges as its gravamen that Kessler fraudulently obtained citizenship by misrepresenting a material fact to the court below. We conclude that the United States has failed to make out a case. It has not proved that Kessler's repeated "arrests" were based on a charge which stated any offense at all, or that her answer to Question 29 was made "with knowledge of falsity and in a willful and deliberate attempt to deceive

9. We have found no decision and none has been cited to us where citizenship has been revoked for failure to disclose facts the revelation of which would not have justified refusal of citizenship in the first place.

Note 3, cited to the text in United States v. Doshen, 3 Cir., 1943, 133 F.2d 757, 760, is not to contrary effect. The false statement in Doshen was pertinent to the inquiry, was within the scope of the authority granted by the statute and was a fraud upon the court.

the government," or that the scope of the inquiry posed by the question properly went to false or illegal arrests. There was failure to prove that Kessler attempted to deceive the United States as to a fact material to the naturalization process, to employ the language of the court below. It must be borne in mind that a very high degree of proof is required in order to revoke citizenship.

As was said in Schneiderman v. United States, 1943, 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796, "In its consequences it [the revocation of citizenship] is more serious than a taking of * * * property, or the imposition of a fine or other penalty. * * * But such a right once conferred should not be taken away without the clearest sort of justification and proof." and, "Especially is this so when the attack is made long after the time when the certificate of citizenship was granted and the citizen has meanwhile met his obligations and has committed no act of lawlessness." See also Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525.

The judgment of the court below will be reversed and the case will be remanded with directions to dismiss the complaint.

McLAUGHLIN, Circuit Judge (dissenting).

In order to bring this case into proper focus it might be well to first briefly restate the facts.

Appellant was born in Russia in 1893 and emigrated to the United States in 1909. Shortly after her arrival in this country she secured employment in the garment industry in Philadelphia and was still so employed at the time of trial. After filing her declaration of intention in 1928 she executed an Application for a Certificate of Arrival and Preliminary Form for Petition of Citizenship on September 24, 1931. Question 29 of that form asked her: "Have you ever been arrested or charged with violation of any law of the United States, State, or any city ordinance or traffic regulation?" Appellant answered the question "No". Again on oral examination by a United States Naturalization Examiner on October 23, 1931, at the time she filed her petition for naturalization appellant, under oath, gave a negative answer when asked whether she had ever been arrested. On January 29, 1932, she was admitted to citizenship pursuant to an order of the United States District Court for the Eastern District of Pennsylvania.

Following an investigation by the Government in 1949 during which it appeared that appellant had been arrested seventeen times between June 4, 1929, and February 19, 1930, the United States on January 10, 1950 brought the instant suit to revoke Miss Kessler's certificate of naturalization on the ground of fraud and illegal procurement. The basis of the denaturalization proceedings was 8 U.S.C. § 738(a) which read as follows:

"(a) It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 701 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured."[1]

The trial court, finding as a fact that appellant's answers to the question con-

1. This section was superseded by the Act of June 27, 1952, c. 477, Title III, Ch. 2, Section 340, 66 Stat. 260, 8 U.S.C.A. § 1451(a), which now reads in pertinent part as follows:

"§ 1451. Revocation of naturalization—Concealment of material evidence; refusal to testify

"(a) It shall be the duty of the United States district attorneys for the respec-

cerning arrests, both in her petition and before the Naturalization Examiner, were false and were made knowingly, wilfully and deliberately for the purpose of deceiving the Government, decreed that appellant's certificate of naturalization be revoked for fraud. The district court having made no finding with respect to illegal procurement, that issue is not before us save as it is raised collaterally by appellant.

There can be no doubt that appellant was arrested seventeen times between June 4, 1929, and February 19, 1930. Appellant's answer to the complaint admits the fact of these arrests, as does her testimony. But while the arrests are not denied it is said that there was no intent on her part to deceive because she believed, at the times she answered the question, that she could not be arrested if she did not "commit anything" and that her union lawyer had told her she had done nothing wrong.[2] I am convinced that, the question of the wilfullness of Miss Kessler's answer being a factual one, there was no error in the trial court's finding of fraud.[3] An examination of the relevant parts of the transcript far from casting a doubt on the correctness of the district court's determination, strongly supports it.

A more serious attack on the order of denaturalization is made on the legal aspects of this case. The majority argues that the arrests were "illegal" because the charge on which they were made, as noted on the police records, was "ob-structing the highway," which, it is stated, was an offense unknown to the law of Pennsylvania. It is asserted that since the arrests were illegal and invalid appellant was justified in her negative answer to Question 29.

The fine spun theory advanced to confine the decision to the allegedly "peculiar" facts here involved points up, if that be needed, the basic misconception by the majority of the purpose of the question. That misconception arises from the acceptance of the fantastic suggestion that appellant is being deprived of citizenship because of an unfounded traffic charge against her. As is perfectly plain from the cases construing 8 U.S.C. § 738(a) and its predecessors, infra, it is not the matters concealed but the fact of concealment which constitutes the fraud for which a suit for denaturalization lies. A so-called "illegal" arrest, although it may be challenged in the proceedings in connection with which it is made and while it may form the basis of a civil suit for false imprisonment or false arrest, is nonetheless an arrest. Were the law otherwise an applicant, fearful that his past encounters with the law would deny him citizenship, need only conceal them and when his concealment is discovered, if it ever is, make a collateral attack on their regularity or legality. Such a state of the law would put a premium on fraud and defeat the purpose of the inquiry, viz., to determine whether the applicant qualifies for citizenship.

tive districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate * * *."

2. Appellant stated on cross examination that she would have answered the question differently if she had understood the significance of an arrest.

3. It may be noted that the court below was not impressed by appellant's contention that her answers were incorrect because she was a woman without formal education. In finding her answers to be fraudulent because wilfully false and made with intent to deceive the court said that appellant is a "self-contained, shrewd and intelligent person."

The opinion then adopts appellant's argument that because the matters concealed would not, if revealed, have served to defeat her petition for citizenship they were immaterial to the inquiry and cannot be made the basis for revocation on account of fraud. The cases hold that a false answer under oath in naturalization proceedings is of itself a sufficient ground for denaturalization under 8 U.S.C. Section 738(a) irrespective of whether the facts concealed would have been a bar to the grant of citizenship had they been known to the court at the time of naturalization.

In United States v. Saracino, 3 Cir., 1930, 43 F.2d 76, this court reversed a decree of the district court and ordered defendant's certificate revoked where it was shown that he had failed to reveal an arrest and conviction. While the non-disclosed data went to moral character, as pleaded by the Government, the court said in 43 F.2d at page 77:

"A naturalization certificate should be canceled if the applicant has committed fraud upon the government. The examination was one step in ascertaining whether the alien was a fit candidate for citizenship. The Supreme Court of the United States has held that the grant of naturalization is one of the highest gifts which can be conferred by the United States. For this reason, it is obvious that the alien must deal with the utmost good faith toward the government."

Again in United States v. Accardo, 208 F.2d 632, we affirmed, per curiam, a denaturalization order of the United States District Court for the District of New Jersey, 113 F.Supp. 783, 785, stating that we agreed with the conclusions there reached by Judge Hartshorne and that it would be a waste of words to add anything to his discussion. In that case defendant had failed to disclose certain arrests and convictions.[4] Deciding that the nondisclosures constituted fraud for which revocation would lie the district court said, "It was defendant's duty to disclose an arrest, as well as a conviction, *in order that the Government might investigate before granting the decree.*" (Emphasis supplied.)

See also Russo v. United States, 1942, 127 F.2d 171, where the Sixth Circuit affirmed an order of denaturalization on the ground that appellant had made wilfully false statements in his application for a certificate of naturalization.

Among the district court denaturalization decisions which are in accord with these views are United States v. Goldstein, E.D.N.Y.1939, 30 F.Supp. 771; United States v. Marcus, D.C.D.N.J.1932, 1 F.Supp. 29; United States v. Di Blasi, D.C.D.N.J.1932, 1 F.Supp. 28, and United States v. Etheridge, D.C.D.Or.1930, 41 F.2d 762. Without discussing these opinions in detail it will suffice to note that they do not adopt the test of materiality urged by appellant.

It is not, however, necessary in the instant appeal to reject this test of materiality in order to affirm the judgment of the trial court since I believe that had appellant's fraud been uncovered before the petition for naturalization was acted on citizenship would not have been granted regardless of the character of the matter fraudulently concealed. This is so because the fact of fraudulent concealment in any matter relating to naturalization or citizenship "involves moral turpitude and exhibits the unfitness of the applicant for the high privilege of citizenship." Del Guercio v. Pupko, 9 Cir., 1947, 160 F.2d 799, 800.[5] In the latter proceeding the applicant had concealed the fact that she had been arrested for and convicted of a morals charge and for a false hotel registration. Although the Ninth Circuit agreed with the district court that the morals charge, as

---

4. Several of the arrests concealed did not result in convictions.

5. The requirement that an applicant be of good moral character has, of course, been a part of all naturalization statutes here pertinent.

explained by appellant, did not reflect adversely upon her moral character, it reversed the lower court's grant of citizenship because of the fraudulent concealment involved. To the same effect are Stevens v. United States, 7 Cir., 1951, 190 F.2d 880, and Sodo v. United States, 1950, 406 Ill. 484, 94 N.E.2d 325. As pointed out in all those decisions, Section 346(a)(1) of the Nationality Act of 1940, 54 Stat. 1163, 8 U.S.C. § 746(a)(1), made it a felony to knowingly make a false statement under oath, orally or in writing, in any matter relating to naturalization or citizenship. While that section has been repealed [6] it is now found in 18 U.S.C. § 1015(a) and was in effect in substantially similar form at the time appellant made the false statements which led to the present action.[7]

This circuit, too, has said that a false answer given in a naturalization proceeding which may conceal lack of qualification for citizenship or head off further inquiry is a material fraud. Rein v. United States, 3 Cir., 1934, 69 F.2d 206. While that matter was a criminal prosecution of a witness who had fraudulently vouched for the good moral character of an applicant for citizenship, the point at issue is the same one raised by appellant. See also our opinion in United States v. Doshen, 1943, 133 F.2d 757, 760, where Judge Biggs, citing authorities, said that the courts have held that *any false statement* made in the course of a naturalization proceeding constitutes a fraud upon the government.

It may be noted parenthetically at this point that the contention to the effect that there can be no revocation of citizenship for fraudulent nondisclosure unless the matter concealed would have prevented naturalization in the first instance, though it would be a proper defense to a charge of illegal procurement (in which case, however, the wilfullness of the concealment would be immaterial), cannot be availed of in a revocation proceeding based on fraud. Here, as mentioned earlier, the district court did not pass on the charge of illegal procurement but did make finding of fraud.

The majority opinion seems to seriously contend that the real intent of the framers of Question 29 calls for the insertion of the word "for" before the word "or" in that question and therefore the question should be viewed as conjunctive instead of disjunctive. It is said the question should have read, "Have you ever been arrested *for* or charged with any violation of any law, etc.," From this it is reasoned that appellant, although knowing she had been arrested, could with complete candor have answered the question in the negative since she did not believe she had ever been properly charged with a violation of any law. Quite aside from the rather startling premise on which it is based a major difficulty with this defense is that appellant herself testified that if she had understood the significance of an arrest when she answered the question she would not have answered it as she did. We are thus brought squarely back to the factual questions of wilful concealment and intent to deceive which have been properly resolved against appellant.

For the above reasons and because I believe the majority's action actually overrules United States v. Accardo, supra, lately decided by this court, I would affirm the order appealed from.

6. 62 Stat. 862.

7. The Act of March 4, 1909, c. 321, Section 80, 35 Stat. 1103 (derived from R.S. Section 5395, p. 1046) read as follows: "Sec. 80. Whoever, in any proceeding under or by virtue of any law relating to the naturalization of aliens, shall knowingly swear falsely in any case where an oath is made or affidavit taken, shall be fined not more than one thousand dollars and imprisoned not more than five years."

By the Act of March 2, 1929, c. 536, Section 9, 45 Stat. 1515, 1516, the above quoted language, which had been made a part of the Criminal Code by the Act of March 4, 1909, was added to the Act of June 29, 1906, 34 Stat. 596, as amended. The Act of June 29, 1906, with the above amendment, was in effect at the times appellant gave the answers in question.