OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

| | |
|---|---|
| OPINION | No. 89-302 |
| of | |
| | MAY 24, 1990 |
| JOHN K. VAN DE KAMP | |
| Attorney General | |
| | |
| ANTHONY S. DaVIGO | |
| Deputy Attorney General | |

THE HONORABLE GARY D. MACOMBER, DIRECTOR OF DEVELOPMENTAL SERVICES, has requested an opinion on the following question:

1.      What sources of funding, if any, in addition to those specified in section 4659 of the Welfare and Institutions Code, must be identified and pursued by a regional center for persons with developmental disabilities?

2.      Do the sources of funding which must be identified and pursued by a regional center for persons with developmental disabilities include parents of developmentally disabled minors?

3.      Do the sources of funding which must be identified and pursued by a regional center for persons with developmental disabilities include the personal and incidental needs increment of federal supplemental security income and state supplementary program benefits?

4.      May a regional center for persons with developmental disabilities initiate an action at law for the purpose of pursuing a source of funding for clients receiving services?

5.      May the Department of Developmental Services adopt regulations governing the means by which regional centers for persons with developmental disabilities may identify sources of funding for clients receiving services?

CONCLUSIONS

1.      The sources of funding, in addition to those specified in section 4659 of the Welfare and Institutions Code, which must be identified and pursued by a regional center for persons with developmental disabilities, include all public funds to which clients receiving services are entitled, and all private funds the payment of which to or for the benefit of the client is legally enforceable.

1.                                                                                  89-302

2.　　　The sources of funding which must be identified and pursued by a regional center for persons with developmental disabilities include parents of developmentally disabled minors, to the extent of their obligation as defined by law.

3.　　　The sources of funding which must be identified and pursued by a regional center for persons with developmental disabilities do not include the personal and incidental needs increment of federal supplemental security income and state supplementary program benefits.

4.　　　A regional center for persons with developmental disabilities may initiate an action at law for the purpose of pursuing a source of funding for clients receiving services.

5.　　　The Department of Developmental Services may, in consultation with the regional centers, adopt regulations governing the means by which regional centers for persons with developmental disabilities may identify and pursue sources of funding for clients receiving services.

ANALYSIS

The State Department of Developmental Services ("DDS," *post*) has jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons. (§ 4416.)[1] "Developmental disabilities" are those which originate before an individual attains the age of 18, can be expected to continue indefinitely, and constitute a substantial handicap. The term includes mental retardation, cerebral palsy, epilepsy, autism, and conditions closely related to or requiring treatment similar to that required for mental retardation, but does not include other conditions solely physical in nature. (§ 4512, subd. (a).) Services for persons with developmental disabilities include those directed toward the alleviation of a disability or toward the social, personal, physical, or economic rehabilitation of a disabled person. Such services may include diagnosis, treatment, living arrangements, physical, occupational, and speech therapy, training, education, employment, recreation, counseling, protective services, transportation and other services. (§ 4512, subd. (b).)

In order to carry out its responsibilities, DDS is authorized and required to contract with appropriate private nonprofit corporations for the establishment and operation of regional centers for persons with developmental disabilities and their families. (§§ 4620 & 4621.) Section 4620 further provides in part:

"The Legislature finds that the service provided to individuals and their families by regional centers is of such a special and unique nature that it cannot be satisfactorily provided by state agencies. Therefore, private nonprofit community agencies shall be utilized by the state for the purpose of operating regional centers."

Regional centers are authorized to conduct casefinding activities (§ 4641), perform initial intake and assessment services (§§ 4642, 4643), and provide preventive services (§ 4644). The centers are required to develop, coordinate, and purchase needed services for individual program plans. (§§ 4646, 4647, & 4648.) They also provide materials and education programs to interested community groups and agencies (§ 4649) and are responsible for the development of an annual plan and program budget for submission to the director of developmental services (§ 4650).

---

1. Undesignated section references are to the Welfare and Institutions Code.

Section 4659 provides as follows:

"(a) Except as otherwise provided in subdivision (c) or (d), the regional center shall identify and pursue all possible sources of funding for clients receiving regional center services. These sources shall include, but not be limited to, both of the following:

"(1) Governmental or other entities or programs required to provide or pay the cost of providing services, including Medi-Cal, Medicare, and Civilian Health and Medical Program for Uniform Services, school districts, and federal supplemental security income and the state supplemental program.

"(2) Private entities, to the maximum extent they are liable for the cost of services, aid, insurance, or medical assistance to the client.

"(b) Any revenues collected by a regional center pursuant to this section shall be applied against the cost of services prior to use of regional center funds for those services. This revenue shall not result in a reduction in the regional center's purchase of services budget, except as it relates to federal supplemental security income and the state supplementary program.

"(c) This section shall not be construed to impose any additional liability on the parents of developmentally disabled children, or to restrict eligibility for, or deny services to, any individual who qualifies for regional center services but is unable to pay."[2]

The first question is whether a regional center may, under subdivision (a) of the foregoing section, identify and pursue sources of funds other than those specified in paragraphs (1) and (2) of that subdivision. The specification of funding sources in subdivision (a)(1), relating to governmental or other entities or programs, consists of Medi-Cal, Medicare, and Civilian Health and Medical Program for Uniform Services, school districts, and federal supplemental security income and the state supplemental program. The list is preceded by the word "including". In the absence of any statutory indication to the contrary (cf. *Coast Oyster Co.* v. *Perluss* (1963) 218 Cal.App.2d 492, 501), the word *include* is ordinarily used as a word of enlargement and not of limitation (*Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 596; 65 Ops.Cal.Atty.Gen. 609, 615 (1982). We look, therefore, to other parts of the statute for indications of legislative intent. In the introductory portion of subdivision (a), the first indicator is the phrase "all possible sources." Manifestly, these universal terms may not be literally construed, since no distinctions are drawn respecting the term "possible," and the pursuit of all such sources is mandatory. A regional center would not be required, for example, to solicit funding from every charitable foundation in the state. The provisions of a statute must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. (*Beaty* v. *Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902.)

Nor would the term "possible" include a source of funding which is otherwise constrained or limited by law. In this regard, Webster's (New Internat. Dict. (3rd ed. 1961) p. 1771) first defines "possible" as being within or up to the limits of one's ability or capacity as determined

---

2. Subdivision (d), referred to in subdivision (a), was deleted in the Assembly on August 7, 1984 (SB 1336).

by nature, <u>authority</u>, circumstances, or other controlling factor. In *United States* v. *Kessler* (3d Cir. 1954) 213 F.2d 53, 57, the court said:

> "Was it the intention of the framers of Question 29 to compel an applicant for citizenship to give information respecting `false arrests' as well as legal and valid arrests? The applicable regulation . . . requires examiners to cover thoroughly the question of `possible' arrests. The adjective `possible' seems to imply at least some regularity of procedure. It is frequently used in ordinary parlance as the equivalent of `permissible,' as for example, to describe the conduct of an agent acting <u>within the scope of his authority</u>, express or implied. The adjective clouds the regulation but we think it was not the intention of its framers to include false arrests within the term `possible arrests' and therefore within the scope of Question 29. To rule otherwise would be to treat the word `possible' under the circumstances of this case as the substantial equivalent of `false' or `invalid.'" (Emphasis added.)

The second principal indicator is the phrase "shall include, but not be limited to," also found in the introductory portion of subdivision (a). In our view, this expression is manifestly inconsistent with a restrictive interpretation of the word "including" in paragraph (1). It has been said that clear statutory language does not require interpretation. (*Holder* v. *Superior Court* (1969) 269 Cal.App.2d 314, 317; 70 Ops.Cal.Atty.Gen. 92, 97 (1987); 68 Ops.Cal.Atty.Gen. 324, 327 (1985).) Consequently, the list in relation to "governmental or other entities or programs" is not exclusive. Nor does anything in paragraph (2) in relation to private entities suggest an exclusive interpretation.

On the other hand, certain qualifications are suggested by the terms and items comprising the lists. As explained in *Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331:

> ". . . the doctrine of *ejusdem generis* . . . states that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage."

(See, 65 Ops.Cal.Atty.Gen. 276, 283 (1982).) We do not deem it essential to the application of the rule that the general words, e.g., "governmental or other entities or programs," precede rather than follow the enumerated particulars. In this regard, the rule is more generally stated: "Particular expressions qualify those which are general." (Civ. Code, § 3534; *In re Marquez* (1935) 3 Cal.2d 625, 629.)

Each of the items comprising the list of "governmental or other entities or programs" in paragraph (1) of subdivision (a) are characteristic of and preceded by the words "required to provide or pay the cost of providing services." In other words, each item is based upon an obligation otherwise prescribed by law. The reference in paragraph (2) to "private entities" is limited by the description "to the maximum extent they are liable for the cost of services. . ." Again, such a description presupposes an otherwise established obligation. This supposition is consistent with the mandatory nature of the duty to "identify and pursue" sources of funding. Mandatory pursuit would appear inappropriate in relation to those innumerable sources, including, for example, charitable

contributions from individuals, organizations and foundations,[3] having no obligation to provide for services or costs. This qualification, i.e., an established obligation, applies, therefore, to all sources of funding. Consequently, the sources of funding in addition to those specified in section 4659, which must be identified and pursued by a regional center, include all public and private funds to which the client receiving services may be entitled.

The second question is whether the sources of funding which must be identified and pursued by a regional center include parents of developmentally disabled minors. It has been argued in this regard, based on the enumeration of *entities* or *programs* in paragraphs (1) and (2) of subdivision (a), that natural persons are excluded under the doctrine of *ejusdem generis*. First, paragraph (2), referring to entities "liable for the cost of services, aid, insurance, or medical assistance," is not characterized by exclusively artificial entities. The word "entities" in both paragraphs (1) and (2) connotes an independent, separate, or self-contained existence. (See *Neustadter* v. *United Exposition Service Co.* (N.J. 1951) 82 A.2d 476, 481; Webster's New Internat. Dict. (3rd ed. 1961) p. 758.) Hence, individual human beings are entities. Second, the express exception in subdivision (c) of a certain class of individuals, e.g., "This section shall not be construed to impose any additional liability on the parents of developmentally disabled children . . .," contemplates the inclusion of natural persons in subdivision (a). Otherwise, the noted exception would be wholly superfluous. Consequently, entities may be public or private, including individuals, corporations, and government agencies.

It may be argued that the "additional liability" referred to in subdivision (c) constitutes a limitation upon the <u>identification</u> and <u>pursuit</u> of parental liability by regional centers, leaving, in effect, all collection of such liability to DDS pursuant to section 4782, providing as follows:

"Parents of children under the age of 18 years who are receiving 24-hour out-of-home care services through a regional center or who are residents of a state hospital or on leave from the state hospital shall be required to pay a fee depending upon their ability to pay, but not to exceed (1) the cost of caring for a normal child at home, as determined by the Director of Developmental Services, or (2) the cost of services provided, whichever is less. The State Department of Developmental Services shall determine, assess, and collect all parental fees in the manner as provided in Section 7513.2. The method of determination of the amount of the fee shall be the same, whether the child is placed in the state hospital or in a public or private community facility. In no event, however, shall parents be charged for diagnosis or counseling services received through the regional centers."

However, we view the constraint upon the imposition of additional liability as a reference to the <u>amount</u> as limited by section 4782, and not as a reference to the pursuit of such obligation. That regional centers are responsible to pursue the parental funding source is further supported by section 4784, subdivision (a):

"The Director of Developmental Services shall establish, annually review, and adjust as needed, a schedule of parental fees for services received through the regional centers . . ."

_____

3. Compare, e.g., section 4781: "The department may accept and expend grants, gifts, and legacies of money . . . ." It is not suggested, of course, that a regional center *may* not solicit such sources for donations.

Consequently, while parents are included as sources of funding, their inclusion does not warrant an interpretation which would expand their liability beyond that otherwise provided in section 4782. This view clearly appears not only from the express terms of subdivision (c) of section 4659, *supra,* but also as a consequence of the specific limitation in subdivision (a), paragraph (2), i.e., "to the maximum extent they are liable . . . ."

It is concluded, therefore, that the sources of funding which must be identified and pursued by a regional center include parents of developmentally disabled minors, to the extent provided by section 4782.

The third inquiry is whether the sources of funding which must be identified and pursued by a regional center include the personal and incidental needs increment of federal supplemental security income and state supplementary program (SSI/SSP) benefits. Under section 12200, subdivision (h), for example, an aged, blind, or disabled aid recipient is entitled to be paid a specified amount for the "personal and incidental needs" of a person receiving care in a medical facility under the Medi-Cal Act. While SSI/SSP is a source of funding specifically referred to in section 4659, is the "personal and incidental" increment one of the "possible sources" of funding within the meaning of subdivision (a) of that section? We think not. First, section 4659 does not stand in isolation, but rather in the context of a universal body and system of laws of which it is part. It follows that in executing the particular statutory responsibility imposed by that section, those charged with its administration must take cognizance of, and effectuate or at least refrain from acting in derogation of other valid governmental policies. (*Zabel* v. *Tabb* (1970) 430 F.2d 199, 209; 67 Ops.Cal.Atty.Gen. 225, 233 (1984).) In our view, the increment for *personal* needs relates to those needs of each individual which are peculiar or proper to private concerns. (See Webster's New Internat. Dict. (3d ed. 1960) p. 1686; and cf. *Stovall* v. *Gartrell* ((Ct. App. Ky. 1960) 332 S.W.2d 256, 260.) That which is *incidental* is subordinate, nonessential, or attendant in position or significance, and likely to ensue as a chance or minor consequence. (See Webster's, *supra,* at 1142.) The phrase "personal and incidental expenses" was considered in *People* v. *Leach* (1964) 42 Misc.2d 143, 247 N.Y.S.2d 198, 201:

"The personal and incidental expenses for the payment of which provision is made are such as relate to those incurred by counsel on his personal account. The word `incidental,' as used in the statute, is associated with the word `personal,' and is used conjunctively. . . . The word `incidental,' as used in the statute, must be construed in accordance with its ordinary meaning, which is: `Of minor importance, occasional, casual; as incidental expenses'; `something subordinate or casual; often used in the plural to mean minor expenses.' Cent.Dict."

Reasonably construed, these essentially discretionary funds were intended to be utilized for purely private concerns and purposes according to the particular inclinations of its recipients, and not to support a government program.[4] In this regard, we construe the words in section 4659 "to *identify and pursue* all possible sources of funding for clients receiving regional center services," as a

---

4. As used in another context, the phrase "personal and incidental needs" clearly suggests an amount to be paid to, and not charged against, the recipient. Section 4474 provides:

"Each patient in a state hospital for the developmentally disabled who has resided in the state hospital for a period of at least 30 days *shall be paid* an amount of aid for his or her personal and incidental needs which when added to his or her income equals twelve dollars and fifty cents ($12.50) per month." (Emphasis added.)

mandate to *take and use* funds from such sources to offset the costs of such services. As provided in subdivision (b) of that section, "Any revenues collected by a regional center pursuant to this section shall be applied against the cost of services prior to the use of regional center funds for those services." The question under consideration, then, is whether the centers may utilize the personal and incidental needs increment for the payment of costs which would otherwise be funded by the state (see §§ 4780, 4780.5). In our view, the pursuit by a regional center of the monetary increment set apart for needs which are personal <u>and</u> incidental, as those words are construed conjunctively (*People* v. *Leach*, *supra*) would operate in derogation of the statutorily designated purposes for which the grant was authorized.

Finally, while the term is not specifically defined in related administrative regulations, personal and incidental needs are expressly excluded from the "basic rate" charged by a licensed community care facility to provide basic services to SSI/SSP recipients. (Tit. 22, C.C.R., § 80001(a)(7).) Rather, personal and incidental needs allowances from funding sources including but not limited to SSI/SSP are among the client's "cash resources." (Tit. 22, C.C.R., § 80001(a)(11)(D).) A community care facility is required to safeguard the cash resources of its clients. (Tit. 22, C.C.R., § 80026(b).) Such cash resources, personal property, and valuables of clients must be held separate and intact, not commingled with facility funds or petty cash, and free from any liability incurred by the facility. (Tit. 22, C.C.R., § 80026(d) and (e).) The facility may not expend a client's cash resources for any basic services; upon discharge, all such cash resources must be surrendered to the client. (Tit. 22, C.C.R., § 80026(f) and (k).) A similar distinction between personal and incidental needs and the costs of care appears in federal regulations. Specifically, a state plan providing for assistance to individuals under title XI of the Social Security Act must provide that in determining financial eligibility for institutional services in intermediate care facilities, available income will be applied first for personal and incidental needs including clothing, and that any remaining income will be applied to the costs of care. (Tit. 45, C.F.R., pt. 234.130(a).)

In view of these distinctions, it is concluded that the personal and incidental needs increment of SSI/SSP benefits is not included within the sources of funding which must be identified and pursued by a regional center.

The fourth question is whether a regional center may initiate an action at law to pursue a source of funding for clients receiving services. The statute specifies neither those means which are permitted nor those which are prohibited. Under these circumstances, the rule applies that where the means by which an official duty is to be accomplished is not prescribed, any reasonable means may be used. (*Harris* v. *Gibbins* (1896) 14 Cal. 418, 421; 70 Ops.Cal.Atty.Gen. 248, 250 (1987).) The rule has been similarly expressed that where a statute confers powers or duties in general terms, all powers and duties incidental and necessary to make such legislation effective are included by implication. (*Clay* v. *City of Los Angeles* (1971) 21 Cal.App.3d 577, 585.) As stated in *Rushing* v. *Powell* (1976) 61 Cal.App.3d 597, 604, ". . . where the main purpose of the statute is expressed, the courts will construe it so as to effectuate that purpose by reading into it what is necessary or incident to the accomplishment of the object sought."

While such determinations as to what may be reasonable, necessary or incident to the accomplishment of the statutory objective must be made initially by the officer charged with its administration (70 Ops.Cal.Atty.Gen., *supra*, 250), we entertain no doubt that such powers would include demand and legal action.

The final question is whether DDS may adopt regulations governing the means by which regional centers may identify and pursue sources of funding. In 62 Ops.Cal.Atty.Gen. 229, 232 (1979), we noted that the primary statutory responsibility of DDS with respect to regional

centers was limited to evaluating the cost effectiveness of their programs while allowing flexibility in the manner in which the desired objectives were achieved. As stated in *Association for Retarded Citizens* v. *Dept. of Dev. Services* (1985) 38 Cal.3d 384, 389-390:

> "Under the statutory scheme it is the regional centers, not DDS, that provide services to developmentally disabled persons and determine the manner in which those services are to be rendered. (See §§ 4620, 4630, 4648, 4651.) DDS has the authority to promote uniformity and cost-effectiveness in the operations of the regional centers. For example, DDS is responsible for developing uniform systems of accounting, budgeting, and reporting (§ 4631, subd. (a)), setting the rates for out-of-home care (§ 4681), and auditing and paying funds to the regional centers (§ 4780.5). In short, whereas the responsibility of the regional centers is broadly to provide each developmentally disabled person with services that enable him to live a more independent and productive life in the community (see §§ 4620, 4630, 4646-4648, 4651), the responsibility of DDS, as the Attorney General has concluded on other occasions, is basically limited to promoting the cost-effectiveness of the operations of the regional centers, and does not extend to the control of the manner in which they provide services or in general operate their programs (64 Ops.Cal.Atty.Gen., *supra*, 910, 916; 62 Ops.Cal.Atty.Gen. 229, 230-231 (1979); see §§ 4629, 4631, 4751-4753)."

Less than five months following the issuance of our 1979 opinion (62 Ops.Cal.Atty.Gen. 229, *supra*), the Legislature added subdivision (a) to section 4631 (Stats. 1979, ch. 1140, § 1) to provide for the adoption of departmental regulations prescribing not only uniform systems of accounting, budgeting, and reporting as noted in *Association for Retarded Citizens*, *supra*, but also "a systematic approach to administrative practices and procedures . . . ." Subdivision (a) provides as follows:

> "In order to provide to the greatest extent practicable a larger degree of uniformity and consistency in the services, <u>funding</u>, and administrative practices of regional centers throughout the state the State Department of Developmental Services shall, in consultation with the regional centers, adopt regulations prescribing a uniform accounting system, a uniform budgeting and encumbrancing system, a <u>systematic approach to administrative practices and procedures</u>, and a uniform reporting system which shall include:

> "(1) Number and costs of diagnostic services provided by each regional center.

> "(2) Number and costs of services by service category purchased by each regional center.

> "(3) All other administrative costs of each regional center." (Emphases added.)

> The term "administrative" describes those acts and practices which are in furtherance of the execution of declared legislative policies and purposes. (*Hubbs* v. *People* ex rel. *Dept. Pub. Works* (1974) 36 Cal.App.3d 1005, 1008-1009; 64 Ops.Cal.Atty.Gen. 690, 694 (1981).) The identification and pursuit of sources of funding, the uniformity and consistency of which among the various regional centers is an express purpose of section 4631, subdivision (a), are acts of administration. The systematic approach to the administrative practices and procedures, including funding, of regional centers, is an expressly authorized subject of regulation. Consequently, DDS

may, in consultation with the regional centers, adopt regulations governing the means by which regional centers may identify and pursue sources of funding.

* * * * *