Terry HEARD et al.

v.

Frank RIZZO et al.

Richard TRAYLOR et al.

v.

Frank RIZZO et al.

Civ. A. Nos. 44151, 44165.

United States District Court
E. D. Pennsylvania.

Partial Order Sur Motions To Dismiss
Jan. 9, 1968.

Memorandum In Support of Order
Jan. 10, 1968.

Supplemental and Final Order Sur
Motions to Dismiss Jan. 10, 1968.

Memorandum Findings and Conclusions
Jan. 12, 1968.

Sur Pleadings and Proof Jan. 30, 1968.

Judgment Affirmed June 17, 1968.
See 88 S.Ct. 2307.

Ronald M. McCaskill, Almanina Barbour, Lois G. Forer, Community Legal Services, Inc., Harvey N. Schmidt, Philadelphia, Pa., for plaintiffs in Civ. A. No. 44151.

Oscar N. Gaskins, Stephen A. Sheller, Joseph Coleman, Philadelphia, Pa., for plaintiffs in Civ. A. No. 44165.

William M. Kunstler, New York City, for all plaintiffs Civ. A. No. 44165 except Father E. Marshall Bevin and Father John Carpenter.

Frank P. Lawley, Jr., Asst. Atty. Gen. for Commonwealth of Pennsylvania, Harrisburg, Pa., for William C. Sennett.

Samuel Gorson, Stanley M. Bashman, Philadelphia, Pa., for Phila. Lodge No. 5, Fraternal Order of Police (amici curiae).

Levy Anderson, First Deputy City Solicitor and John M. McNally, Jr., Theodore H. Lunine, Asst. City Solicitors, Edward G. Bauer, Jr., Philadelphia Pa., for Frank Rizzo, John Doe, Richard Roe, et al., Fred Corletto, James H. J. Tate and Arlen Specter.

Michael J. Rotko, Asst. Dist. Atty. of Phila. County, Philadelphia Pa., for Arlen Specter.

Paul Bender, Washington, D. C., and Burton Caine, Philadelphia, Pa., for American Civil Liberties Union (amici curiae).

Before VAN DUSEN, Circuit Judge, and LORD and TROUTMAN, District Judges.

PER CURIAM.

## PARTIAL ORDER SUR MOTIONS TO DISMISS

And now, January 9, 1968, "it is ordered that those portions of the complaints seeking relief under the Civil Rights Acts (42 U.S.C. §§ 1981–1983 & 1985) and the Federal Rules of Civil Procedure including F.R.Civ.P. 53 are dismissed without prejudice to the right of plaintiffs to file within 14 days additional civil actions, or a further amendment to each of such complaints, setting forth as against the present defendants in distinct counts the above mentioned claims, or such parts of them as they wish to press, separately from the claims that the acts of the Pennsylvania General Assembly enumerated in the Complaints are unconstitutional."

## MEMORANDUM IN SUPPORT OF ORDER OF 1/9/68

These complaints combine primary requests for relief against the enforcement of criminal statutes of Pennsylvania on the ground that they are unconstitutional by a three judge court under 28 U.S. C. §§ 2281–2284 with related applications that the law enforcement officers of the City of Philadelphia be restrained under the Civil Rights Acts (42 U.S.C. §§ 1981–1983 & 1985) from depriving juveniles and adults of their civil rights by alleged cruel and oppressive treatment. The applications under the Civil Rights Acts include a request that a Special Master be (1) appointed Receiver of the Police Department with full power to control all affairs of that department and its members and (2) authorized to hold hearings at which members of the public may present plans for the rehabilitation of the police department (presumably under F. R.Civ.P. 53). Part of the factual background of the claims under the Civil Rights Acts is the November 17 demonstration which is the major basis for the contention that the legislative acts have been applied in an unconstitutional way, but the plaintiffs have proposed to offer much evidence of alleged illegal police action unrelated to these legislative acts.

The probability that the evidence offered by plaintiffs under the Civil Rights Acts (without estimating the time to be taken in receiving evidence to be offered by defendants, who vigorously dispute plaintiffs' contention) will take considerably more than a week is indicated by the following, inter alia:

A. The complaints contain allegations such as these:

(1) the officials and officers of the Philadelphia Police Department "have repeatedly physically abused, beaten, detained, held in custody, arrested the plaintiffs, deprived them of their liberty and of their property, * * * and without probable cause have placed plaintiffs under surveillance * * * and threaten to continue said course of conduct * * * (p. 2 of Complaint on C.A. 44,151),

(2) the above enumerated officials and officers "have established a pattern of conduct * * * denying plaintiffs the right to see counsel and prohibiting counsel from seeing their client * *" (p. 3 of Complaint on C.A. 44,151), and

(3) "For a period of years * * * defendant Rizzo has engaged in a series of raids, involving multiple arrests without probable cause, harrassment and annoyance of teenage boys and girls whose lawful behaviour or appearance is unorthodox or unusual. (He) has arrested or caused the arrest without warrant of youths who were patrons at coffee houses, who frequented Rittenhouse Square and other public places, and who assembled peacefully on the streets of

Philadelphia." (p. 5 of Complaint on C.A. 44,151.

B. Plaintiffs in Civil Action 44151 have adopted as an amplification of their claims under the Civil Rights Acts on page 18, affidavit of Spencer Coxe, Esquire, (attached to Doc. #37), enumerating alleged instances of deprivations of civil liberties most of which are unconnected with any of the acts contended to be unconstitutional. Similarly, Exhibits P 148–150 describes alleged instances of police brutality arrests and entry of homes, detaining of citizens for many hours for questioning without any charge and for the purpose of harrassing demonstrations, the exercise of first amendment rights, etc., without warrants and other alleged deprivations of civil liberties, where the activities were done by the police and were not carried out under the statutes sought to be declared unconstitutional.

C. Stephen A. Sheller, Esq., one of the attorneys for plaintiff in C.A. 44,165 made this statement to the Court on Jan. 8, 1968:

"I see something more crucial and that is that we have * * * we could produce a couple of hundred people in terms of arrest and release and so forth * * * I am interested in presenting great numbers of people who have been picked up, questioned with regard to first amendment activities. The arrest occurred and then release and no charges * * * held for the jury at the time and in many instances beaten. * * * " This one lawyer alone stated that he would estimate as much as 3 days for his testimony. Another attorney for plaintiffs has had the affidavits of over 70 persons marked as Exhibits which contain allegations of the denial of civil rights of the type described in the Complaint so that these deponents may be called as witnesses.

D. Counsel for plaintiffs were unwilling to limit their presentation of evidence of their claims under the Civil Rights Acts to 1½ days in addition to the previous 6½ hearing days, when this option was suggested to them by the Court on Jan. 8, 1968.

The existence of two basically different claims for relief involving different types of federal courts and not separated into two separate counts of the Complaint was called to the attention of plaintiff's counsel no later than the 4th and 5th day of the proceedings. Congress has provided in 28 U.S.C. § 2284(4) that applications to restrain the enforcement of state statutes on the ground of its constitutionality before a three judge federal court "shall be given precedence and assigned for a hearing at the earliest practicable day," whereas applications to restrain the executive branch of the government from violating the civil rights of members of the Community are normally heard by a single judge federal court. See Phillips v. United States, 312 U.S. 246, 252, 61 S.Ct. 480, 85 L.Ed. 800 and other cases cited at N.T. 834–835.

We suggested that the parties stipulate that they requested that the three judge court pass on the claims under the Civil Rights Acts and for the appointment of a Master under the Federal Rules of Civil Procedure (F.P.Civ.P. 53) with a limitation to 1½ days on the length of the additional hearings in plaintiffs' case in order that the community might have a prompt disposition of the serious allegations of arbitrary denial by the Philadelphia police of the civil rights of both adults and juveniles in the Philadelphia Community. The limitation on the hearing time allocated to this part of the complaints was felt necessary in order to carry out the Congressional Mandate that consideration of the alleged unconstitutionality of state statutes be given "precedence" as well as to comply with the strict construction to be applied to 28 U.S.C. §§ 2281–2284. However, as noted above, counsel for plaintiffs were unwilling to agree on the suggested limitation and did not all agree on any definite limitation.

The broad range of alleged repeated police denial of Civil Rights in the Complaint and in the documents mentioned

above makes it probable that if plaintiffs establish their case, there may well be future hearings required on issues of compliance with any injunction issued. This would take additional time of three judges which this busy court can ill afford. As recently as Kesler v. Dept. of Public Safety, 369 U.S. 153, 156, 82 S.Ct. 807, 810, 7 L.Ed.2d 641 (1962), the Supreme Court of the United States has emphasized that the court had already held that a three judge court "involves a serious drain upon the federal judicial manpower."

Under these circumstances, the order of January 9, 1968 was required by the record in this case as part of the rulings on the defendants' Motions to Dismiss under F.R.Civ.P. 41(b).

## SUPPLEMENTAL AND FINAL ORDER SUR MOTIONS TO DISMISS

And now, January 10, 1968, after consideration of the record and on the basis of the findings and conclusions contained in the attached Partial Memorandum, it is ordered that the Motions to Dismiss under Fed.R.Civ.P. 41(b) filed yesterday are denied in so far as they request dismissal of the allegations of unconstitutionality of the following statutes and are granted in all other respects including the Order of January 9, 1968:

18 P.S. § 4406 (Disorderly Conduct)

18 P.S. § 4401 (Riots, Routs, Assemblies and Affrays)

18 P.S. § 4302 (Conspiracy To Do Unlawful Act)

18 P.S. § 4532 (Corrupting Morals of Minor)

18 P.S. § 5101 (Covering Breach of the Peace and Inciting to Riot)

## MEMORANDUM OF FINDINGS AND CONCLUSIONS SUR DEFENDANTS' MOTIONS UNDER FEDERAL RULES OF CIVIL PROCEDURE 41(b) AT THE CONCLUSION OF PLAINTIFFS' CASE

These class actions are before the Court on defendants' motions to dismiss under Federal Rules of Civil Procedure 41(b) at the conclusion of plaintiffs' evidence in support of their allegations that certain enumerated criminal statutes of Pennsylvania are unconstitutional · as worded and/or as applied.

Plaintiffs have called witnesses offering diametrically opposing testimony as to the conditions existing between 11:45 A.M. and 12:45 P.M., on Friday, November 17, 1967, outside the Philadelphia Board of Education building while representatives of the black community requested changes of condition in the Philadelphia schools at a conference with representatives of the Philadelphia Board of Education. This conflicting testimony may, in part, be due to the fact that many of plaintiffs' witnesses were inside the building without a full view of the noise and conditions at and near the corner of Winter Street and 21st Street during the above period.

There is no dispute that the Police Department was advised on the late afternoon of November 16 that the number of demonstrators expected on November 17 was estimated by the school officials to be three hundred and the Board's fifteen security officers (former policemen) were considered by the School Board to be sufficient to handle the group, but that over three thousand were present by noon. The school officials were advised on November 16 that a limited number of non-uniformed police of the Civil Disobedience Unit would be present the next morning and there was one van of uniformed officers in reserve several blocks from the building.

As a result of a call from the Chief of the Civil Disobedience Unit at or after 11:30 A.M., Commissioner of Police Rizzo arrived at the Board of Education building about 12 Noon and testified as follows:

1. He ordered 111 men who had just been in a promotion ceremony at City Hall to the area and put in effect Riot Plan No. 3 to prevent the demonstrators from going north into a residential area of the city. Additional police were

also apparently brought to 21st and Winter Streets.

2. He found a howling, undisciplined and disorganized mob which had taken over the area of 21st and Winter Streets. The mob of full-grown juveniles and adults were running over the tops of parked vehicles and hurling obscenities at the police.

3. Police moved in among the mob about 12:30 P.M. and cleared the streets in the area in ten minutes. The order to move in was given to assist two or three policemen who had arrested a prisoner and were being attacked by the mob which was trying to rescue the prisoner. Aerials were being ripped from cars and other damage was being done by the young demonstrators.

Mrs. Gold testified that she saw two boys arrested by the police and one of them swung his arm at the arresting police officer. Mr. DeLone and Reverend Nichols testified that the students were singing "B. P." (Black Power) songs and chants. Reverend Nichols testified that there was some vulgarity among some of the young people.

The other testimony stated that the crowd was orderly, there was no need for the police to move in swinging their clubs, and the police used brutal, excessive force. Also, many of those arrested on November 17 testified that there were no grounds for such arrests.

■ ■ In view of the above testimony plaintiffs have failed to carry the "extremely heavy burden" required in order to justify a finding by a Federal Court that certain criminal statutes of a State legislature are unconstitutional as applied. See Carmichael v. Allen, 267 F.Supp. 985, 997 (N.D.Ga., 1966).

The plaintiffs have only raised a doubt in the Court's mind as to what occurred on November 17, 1967, at about noon, at 21st and Winter Streets. They have not negatived the testimony of the Police Commissioner that he was required to make a decision during a riotous situation where his officers were being attacked during an effort of others to rescue a prisoner from police custody. We do not find on this record that the Police Commissioner acted in bad faith in directing the police to move into the mob. However, in making the arrests listed on P 141 and 142 the law enforcement officials of Philadelphia, having properly cleared the streets of a mob, may have applied the Pennsylvania criminal statutes listed in the order of January 10, 1968, overbroadly and indiscriminately in a situation where citizens were exercising their First Amendment rights. There is other evidence in the record indicating that these criminal statutes may have been indiscriminately used in the fall of 1967 as the basis for charges against persons exercising their First Amendment rights in the Philadelphia community. See, for example, testimony of Mr. Hinrichs (N.T. 626 ff).

It is noted that the statutes listed below, on their face, cannot be construed to regulate free expression. Under such circumstances, it is not required that this Court determine their constitutionality and the Court may more properly abstain from such a determination.

For the foregoing and following reasons, we dismiss the complaints in the above actions insofar as these allegedly unconstitutional statutes are concerned:

1. *Loitering Act.* 18 P.S. § 4418

The parties agree that the complaints must be dismissed as to this Act.

2. *Uniform Firearms Act.* 18 P.S. § 4628

The parties agree that the complaints must be dismissed as to this Act.

3. *Sedition Act.* 18 P.S. § 4207

■ Plaintiffs attack the Sedition Act of 1939 as overbroad and vague (p. 28a of their brief). The decision of Uphaus v. Wyman, 360 U.S. 72, 81, 76, 79 S.Ct. 1040, 1046, 3 L.Ed.2d 1090 (1959), has shown that such State sedition statutes are legitimate exercises of State police power as long as "the State's interest has not been 'pressed * * * to a point where it has come into fatal collision with the overriding' constitutionally

protected rights", and held that the "basis of [Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1965)] * * * rejects the notion that it stripped the States of the right to protect themselves".

■ Accordingly, we may analyze the Sedition Act for such a "fatal collision" if challenged as overbroad or vague and thus in violation of Fourteenth and First Amendment rights. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (December 5, 1967). After analysis of the Act, we agree with the plaintiffs' contention that subsection (c) is unconstitutionally vague [1], at least to the extent that it proscribes certain conduct using (encouragement of) *"hatred"* as an operative part of the definition. See Commonwealth v. Nelson, 377 Pa. 58, 104 A. 2d 133, 135 n. 1 (1954) which gives every indication that the Supreme Court of Pennsylvania shares this view.

Although the defendants have pointed out that no prosecutions under subsection (c) have been undertaken for fourteen years, and none are contemplated, in Carmichael v. Allen, 267 F.Supp. 985, 994 (N.D.Ga.1967), the court pointed out:

"It is hardly necessary to point out the 'chilling' effect upon the exercise of the freedom of speech and assembly of a (criminal) statute prescribing punishment * * * if a person, conscientiously seeking to exercise these rights, must pattern his speech with the ever present threat of such * * * sanction[s]."

The rest of the Sedition Act, which we find severable from the offending subsection, appears constitutional on its face [2].

4. *Obstructing an Officer.* 18 P.S. § 4314

" * * * whoever being required by any officer, neglects or refuses to assist him in the execution of his office in any criminal case, or in the preservation of the peace, or in apprehending and securing any person for a breach of the peace is guilty of a misdemeanor * * *. As amended 1963, July 11, P.L. 234, § 1." [3]

The plaintiffs contend that this portion of the statute is unconstitutional on its face in that it permits a police officer to compel a citizen to assist him in the exercise of his official duties, thereby depriving the citizen of an unenumerated right secured to him by the Ninth Amendment to be left alone and do as he chooses.

■ However, the Supreme Court has indicated that a Federal Court should decline to adjudicate constitutional claims where it would result either in the needless adjudication of a Federal constitutional question or in the preservation of Federal-State relationships. Where a plaintiff seeks to prevent the application to him and others similarly situated of criminal statutes before indictment and trial in criminal courts of a State, the Supreme Court carved out a narrow exception to this general rule of abstention and squarely held in Dombrowski v. Pfister, 380 U.S. 479, 489–490, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22 (1965), that "the abstention doctrine is inappropriate for cases such as the present one where * * * statutes are justifiably attacked on their face as abridging free expression * * *". See also Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (December 5, 1967).

1. We do not attempt to distinguish one objection as "vague" in contrast to "overbroad", since the outlines of such a distinction are unclear to us at present. See Mr. Justice Harlan's concurrence, Zwickler v. Koota, 389 U.S. at 255, 257, 88 S.Ct. 391, 399, 19 L.Ed.2d 444.

2. There is no evidence in this record that the Sedition Act, 18 P.S. § 4207, is being

unconstitutionally applied. Cf. footnote 5 infra.

3. Counsel for the plaintiffs have indicated to the Court that they wish to limit their attack on the constitutionality of this statute to the portion quoted; they have also agreed that they are not attacking the constitutionality of 18 P.S. § 4314.1, "Committing an aggravated assault and battery upon a police officer."

■ In view of this limitation on the abstention doctrine, it is apparent that we should not pass upon the constitutionality of this portion of the statute. It does not purport to regulate free expression but only the obstructing of a police officer in the performance of his official duties, including the refusal to assist him in the event such assistance is requested. Moreover, no evidence has been introduced into this record which would appear to indicate that this statute is being unconstitutionally applied. We, therefore, abstain from any determination as to the constitutionality of this statute.[4]

**5.** *Carrying Concealed Deadly Weapons.* 18 P.S. § 4416

■ Abstention is proper in the case of this statute. The statute provides in part:

"Whoever carries any firearm, slingshot, handy-billy, dirk knife, razor *or any other deadly weapon,* concealed upon his person * * *." (Emphasis supplied.)

Plaintiffs' argument is that the term "any other deadly weapon" is vague. While this may be true, it need not be ruled upon here. The rule in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116 (1965) of determining the constitutionality of statutes operates when the statute "as applied" or "on its face" is capable of having a chilling effect on freedom of expression. Thus, while a vague disorderly conduct statute might inhibit a citizen from peaceful protest, the worst a vague "carrying concealed deadly weapons statute" might inhibit is carrying a non-deadly weapon. "Carrying weapons" is not a protected constitutional right *of expression.* Dombrowski was not concerned with the chilling effect on

non-freedom of expression rights. Similarly, this Court should not be so concerned. Abstention is the proper procedure as regards this Act.

**6.** *Revolutionary Activities.* 18 P.S. § 3811

While this statute, on its face, does not differentiate between active as opposed to passive membership, Scales v. United States, 367 U.S. 203, 227, 228, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1960), or between knowledge of the revolutionary object or purpose of a subversive organization as opposed to specific intent on the part of the individual to accomplish the revolutionary object or purpose of such an organization, Scales v. United States, supra, at 229, 230, 81 S.Ct. 1469; Noto v. United States, 367 U.S. 290, 299, 300, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961), it cannot be denied that given the opportunity this statute is readily susceptible to such a limiting construction by State courts. It is apparent that such a limiting construction may readily be anticipated " * * * as the result of a single criminal prosecution * * * " and would not require the sort of "piecemeal" "hammering out" of the structure of the statute alluded to by the Supreme Court in Dombrowski v. Pfister, 380 U.S. 479, 491, 85 S.Ct. 1116 (1965). See also Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (December 5, 1967).

Furthermore, it does not appear from the record that this statute was being applied in an unconstitutional manner. There is no evidence that the defendants have, in bad faith or without hope of ultimate success, invoked, or threaten to invoke, criminal process under this statute.[5]

■ Accordingly, we will abstain from passing upon the constitutionality of this

---

**4.** Were we to pass upon the constitutionality of this portion of the statute, we would find it constitutional at this time except insofar as it incorporates by reference the crime of breach of the peace; to that extent, we would defer ruling until we determined the constitutionality of the crime of breach of the peace.

**5.** Exhibits P-151 and P-152 make clear that there was sufficient evidence to justify a charge under this act in the case which was the subject-matter of the testimony in those exhibits.

statute in the interest of preserving Federal-State relationships and the avoidance of needless adjudication of constitutional issues. See Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963); Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951).

7. *Juvenile Court Law.* 11 P.S. § 243 ff.

■ On this record, the court should abstain from finding the Juvenile Court Law of 1933, as amended, 11 P.S. § 243 ff, unconstitutional on its face or as applied as requested in A. 1 on page 8 of the complaint in C.A. 44,151.

A. Constitutionality of Juvenile Court Law as applied.

There has been no showing that action taken under this law has had a chilling effect on freedom of expression, freedom of speech or the right peaceably to protest. We find that there is no substantial evidence in the record that this law is being used for the ulterior purpose or with the effect of interfering with the protected First Amendment rights of the plaintiffs. The evidence in this case shows that any chilling effect on these First Amendment rights of the plaintiffs in C.A. 44,151 has resulted from action of the Philadelphia law enforcement authorities (the present defendants in these suits) rather than from activities of the Juvenile Court representatives. There is no evidence that such representatives had anything to do with the charges on P-142. The evidence shows that K. C. Washington, whose testimony is that he was engaging in activities apparently within the scope of the First Amendment (N.T. 734 ff), was discharged when he arrived before a Juvenile Court representative after initially being held by the police. As stated in Carmichael v. Allen, 267 F.Supp. 985, 996 (N.D.Ga.1967), a plaintiff

"does not have the right to interfere with every state prosecution, even though he may ultimately establish the fact that the statute under which the State is prosecuting him is void for vagueness on general constitutional grounds. It is only in such situations where the overbreadth of the statute interferes with a First Amendment right, such as the freedom of expression, or where the normal state trial does not assure adequate vindication of constitutional rights, that an equity court can properly be called upon to enjoin prosecutions on the ground of vagueness of a statute."

■ The principal claims of plaintiffs are that a substantial number of juveniles are adjudicated as delinquent by the court without counsel and without notice and that the court uses at times an "intake" summary prepared before the Juvenile is warned as to his privilege against self-incrimination by non-judicial employees, in cross-examining juveniles before they are adjudged delinquent.[6] The requirements of providing counsel for juveniles and of adequate notice were clearly set forth by the Supreme Court of the United States on May 15, 1967. See In re Gault, 387 U.S. 1, 31–42, 87 S.Ct. 1428, 18 L.Ed.2d 527. The testimony indicates that substantial numbers of juveniles are not being represented by counsel and are not receiving adequate notice of the charges against them. However, it is less than eight months since the above decision was announced and the record makes clear that Judge Green has devised a plan of preliminary calls or hearings (N.T. 801–2) to assure that juveniles will appear with counsel at the adjudicatory hearing and further that Petitions of Delinquency containing adequate notice (N.T. 800–841) are sent to all counsel entering their appearance for juveniles. The principal impediment to

---

**6.** As to Par. 5 of the Stipulation offered Jan. 8, it is noted that it is not clear that this summary is used at a hearing prior to or subsequent to the adjudication of delinquency. The court may consider it in determining the treatment to be accorded a previously adjudicated delinquent provided that the juvenile is confronted with information from non-confidential sources. See Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

compliance with the above requirements of *Gault* is the admitted inability of Community Legal Services [7] to provide counsel for the number of indigent juveniles requiring such counsel. We do not believe that this act should be held unconstitutional for the failure of the Juvenile Division of the County Court to work out a completely effective system in the past eight months when they are laboring with a staggering case load and very difficult problems (see P-147 (page 372) and N.T. 804 ff). It is also noted that the state appellate courts are alert to the problems arising under this law in view of the *Gault* decision. See Commonwealth v. Johnson, 211 Pa.Super. 62, 234 A.2d 9 (1967). This record does not establish a clear, as opposed to rare, failure to observe juveniles' rights against self-incrimination (*Gault,* supra, 387 U.S. at 58, 87 S.Ct. 1428) and the requirements of Kent v. United States, 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed. 2d 84 (1966).[8]

It is noted that the *Gault* decision, supra, contained this language 387 U.S. at page 21, 87 S.Ct. at page 1440:

"* * * As we shall discuss, the observance of due process standards, intelligently and not ruthlessly administered, will not compel the States to abandon or displace any of the substantive benefits of the juvenile process."

Also, at page 13, 87 S.Ct. at page 1436, the Supreme Court of the United States said in that decision:

"We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile 'delinquents.' For example, we are not here concerned with the procedures or constitutional rights applicable to the prejudicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process. * * * We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution."

B. Constitutionality of Juvenile Court Law On its Face.

Although the generality of various terms [9] in this law makes them subject to question for vagueness and overbreadth, no evidence has been produced indicating reliance on such terms in the application of the act and counsel conceded that amendments to this law were in process of preparation in the light of *In re Gault,* supra.

Furthermore, writs of habeas corpus in both state and federal courts as well as direct appeals are available as remedies in case of excessively broad interpretation of the scope of such terms. See, e. g., United States ex rel. Young v. Prasse, 263 F.Supp. 122 (E.D.Pa.1967) and subsequent opinions and orders in that case.

Other contentions of plaintiffs are rejected in view of this record.[10]

---

7. Judge Green (Chief Judge of Juvenile Division, County Court) and the Philadelphia Bar Association may find that more effective representation of indigent juveniles can be accomplished by having the Voluntary Defender, which has had many years' experience in the representation of large numbers of indigent adults, take over this responsibility in this juvenile field.

8. See footnote 6 supra.

9. For example, "wayward" in 11 P.S. § 243(b), injuring "health or morals" in 11 P.S. § 243(d), "disreputable place" in 11 P.S. § 243(e). Article II § 8, paragraph 2(b) of the Standard Juvenile Court Act seems to be clearer in its emphasis on environment and behavior which is injurious to the juvenile or others.

10. For example, plaintiffs' objections as to the length of commitments for treatment of juveniles appear to be answered by Cunningham v. United States, 256 F.

The foregoing completed memorandum is in support of the Order of January 10, 1968.

## SUR PLEADINGS AND PROOF

These cases are before the court after hearings held December 11–13 and January 2–5, 8, 9, 11, 12, 15 and 16 [1] on plaintiffs application for (A) a declaratory judgment that the following statutes of the Pennsylvania Legislature are unconstitutional and null and void:

18 P.S. § 4406 (Disorderly Conduct)

18 P.S. § 4401 (Riots, Routs, Assemblies and Affrays)

18 P.S. § 4302 (Conspiracy To Do Unlawful Act)

18 P.S. § 4532 (Corrupting Morals of Minor)

18 P.S. § 5101 (Covering Breach of the Peace and Inciting to Riot) [2], and

(B) a permanent injunction restraining the defendants from taking any further action with respect to the named plaintiffs and members of their class under the aforesaid statutes for the purpose of inhibiting the exercise of free speech, assembly, and petitioning for redress of grievances.[3]

Plaintiffs contend that these statutes are void on their face and as applied since the Philadelphia law enforcement authorities are applying them "for the purpose of inhibiting the exercise of free speech, assembly, and petition for redress of grievances." The major subject of the testimony at the above hearing was the conduct of the Philadelphia police at a November 17, 1967 demonstration outside the Administration Building of the School District of Philadelphia (hereinafter called "School Administration Building") at 21st and Winter Streets for the purpose of changing certain practices in the Philadelphia Schools. The background of this demonstration has been

2d 467 (5th Cir. 1958); Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962); Rogers v. United States, 326 F.2d 56 (10th Cir. 1963).

1. Through agreement reached by counsel in December, 1967, the case is before the Court on final hearing (N.T. 657). Over 2000 pages of transcript have been recorded by the official court reporter on these 13 days of hearings and less than 310 pages of this testimony was presented by defendants (N.T. 1629 to 1936). This large amount of testimony would have been increased to a far greater extent if the additional testimony offered by plaintiffs in support of their civil rights claims had been received. See Memorandum of January 10, 1968, in Support of January 9 Order (Doc. 38 in C.A. 44151) and N.T. 1456–1457, where the presentation of "great numbers of" witnesses in addition to expert witnesses was stated by plaintiff's counsel (See also N.T. 1447–1459). It is noted that 3, as opposed to 13, days of hearings were conducted by the statutory three-judge court in Baker et al. v. Bindner et al., 274 F.Supp. 658 (W.D.Ky.) relied on by plaintiffs and at page 2 of the October 13, 1967 opinion, the Court refers to such 3 days as constituting "an extensive factual hearing". Under these circumstances, it is difficult to understand

the indication at page 6 of Doc. 43 in C.A. 44151 (Supplemental Memorandum of Law) that the Court precluded the offering of any evidence concerning November 17, 1967 arrests which showed that the statutes were unconstitutional as applied.

It is also noted that defendants refrained (N.T. 1861 and 1855) from calling their civilian witnesses, including citizens injured by the mob (N.T. 353), and presenting other evidence. Hence, this data would be presented more appropriately in defense to the broad claims under the Civil Rights Acts. See Memorandum of January 10, 1968.

2. As explained in the Memorandum of January 12, 1968, these cases were dismissed as to several other Criminal Acts of the Pennsylvania General Assembly at the end of the plaintiffs' case.

3. As explained in the Memorandum of January 10, 1968, those portions of the complaints seeking relief under the Civil Rights Acts (42 U.S.C. 1981–1983 and 1985) and under the Federal Rules of Civil Procedure (such as F.R.Civ.P. 53 and 66) were dismissed at the end of the plaintiffs' case without prejudice to their restatement as provided in the order of January 9, 1968, which was amended by order of January 19, 1968.

stated in the January 12 Memorandum at pages 1–3.[4]

▮ Before further reference to the evidence, bearing on the challenge to the constitutionality of these statutes, we emphasize that the court is not now considering the serious allegations of the Complaint and Doc. 37[5] that the Philadelphia law enforcement officials are denying the Civil Rights of plaintiffs. These considerations emphasize plaintiffs' rights under the First Amendment to the Constitution of the United States, their rights to be free from the alleged misuse of excessive force by such officials and the wrongful failure of such officials to take reasonable action to preserve law and order toward them without discrimination. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Basista v. Weir, 340 F.2d 74, 80 (3rd Cir. 1965); Huey v. Barloga, 277 F.Supp. 864 (N.D.Ill. Dec. 27, 1967.[6] No police department is above the law. Everyone in this country, irrespective of his color, is entitled to be treated by the police with dignity and without brutality as long as he does not use force against, or resist, the police. Although the subject of excessive police force on November 17 is not before us, all citizens must be concerned at the extensive testimony on this subject.[7]

It is most unfortunate, both for plaintiffs and for the Philadelphia community, that these civil rights' claims were not stated in a separate count of the complaints by plaintiffs for consideration by a one judge court, and that counsel for plaintiffs have not taken the protective action of restating them as suggested by the order of January 9, 1968, and the amendment to that order of January 19, 1968.

Community Legal Services, a nonprofit corporation designed to protect the rights of juveniles in the courts, has asked the court primarily to invalidate the legal system (imperfect as are most man-made systems) under which juveniles have been given special treatment in this Commonwealth for many years. This action is taken in the absence of any substitute for the Juvenile Court Act and at a time when much of our urban crime is committed by juveniles. These suits challenging the validity of statutes have diverted attention from and, because Congress has provided precedence for such attacks, have prevented the court from considering the allegations of brutal police action and of other police state meth-

---

4. The following stipulations also appear at N.T. 128–129:

"On November 17, 1967, at approximately 11 A.M., certain White and Black adults and schoolchildren made a presentation for improvement in the School System to certain members of the Board of Education and certain representatives of the school administration in the Board of Education Building at 21st and Winter Streets. * * * From approximately 10 A.M. on, including during the time the above-mentioned meeting was going on in the Board of Education Building on November 17th, schoolchildren assembled in the vicinity of the Board of Education Building at 21st and Winter Streets. * * * Subsequently, certain juveniles and adults who were present outside the Police Administration Building at 8th and Race Streets were arrested."

5. See Memorandum of January 10, 1968 (Doc. 38 in C.A. 44151).

6. In the *Huey* case, the Court used this language:

"'State governments have a basic responsibility to maintain an orderly society. To discharge this responsibility, state and local officials must take reasonable steps to preserve law and order and to provide for the personal safety of individual members of society. The Fourteenth Amendment requires that state officials exercise this duty towards all classes of persons without distinction. * * * Section 1983 has been interpreted to provide a new type of tort: the invasion, under color of law, of a citizen's constitutional rights. It is also clear that it is not necessary that this invasion be intentional; it may merely be negligent. * * *'"

7. For example, see the testimony of Messrs. Coleman, DeLone Ronald Miller, Reverend Nichols, Mrs. Gold and Mrs. Struve, among others.

ods contained in the complaints. Apparently, counsel for plaintiffs (including counsel for Community Legal Services which has secondarily contended that the other statutes challenged are unconstitutional) were persuaded, possibly by the Law Center for Constitutional Rights (see P 31 of Doc. 16 in C.A. 44151), being a non-profit corporation based in Newark, New Jersey, that their primary attack should be on the Pennsylvania statutes in order to secure a three-judge court rather than urging causes of action under the Civil Rights Acts, (42 U.S.C. §§ 1981–1983 & 1985) presented to a one judge court. In view of the statements of counsel (see footnote 1), the authorities cited in the Memorandum of Jan. 10 (the cases cited at N.T. 834–845 referred to at page 5 of that Memorandum are Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 375, 69 S.Ct. 606, 93 L.Ed. 741 (1949); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); and Kesler v. Dept. of Public Safety, 369 U.S. 153, 156, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962)) and the reasons given in that Memorandum, we believe that the court properly exercised its discretion in refusing to extend the thirteen days of hearings before the three judge court for a substantially longer period in order to pass on the causes of action under the Civil Rights Acts. We believe we are entitled to take into consideration that this court has one of the most congested federal district court dockets in the country.

The following language in People of State of New York v. Galamison, 342 F.2d 255, 265, 8 A.L.R.3d 263 (2nd Cir. 1965) is pertinent to these claims under the Civil Rights Acts:

"Although alleged denial of equal protection in schools and other respects afforded the motivation and was the subject of appellants' acts, neither the equal protection clause nor § 1981 confers 'color of authority' to perform acts which a state alleges to be in violation of laws of general application intended to preserve the peace from disturbance by anyone. The constitutional provision and the statute are addressed to preventing inequality in the treatment of conduct, and to that great purpose alone. They give no constitutional defense, let alone 'authority,' for disregard of laws providing for the equal punishment of disturbers of the peace simply because the disturbances were in the course of protests over alleged denial of equality in schools, housing or economic opportunity—any more than the Second Amendment bestows 'authority' to disturb the peace in the course of a protest over an alleged denial of the right to keep arms or the Fourth Amendment does so with respect to a protest over police methods."

 We state our belief in the importance of public school education and the duty as well as the right of the Commonwealth to further and protect it. The rights of those desiring to object to the conduct of the schools is not unlimited.[8] In Cox v. State of Louisiana, 379 U.S. 536, 554–555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965) the Supreme Court of the United States pointed out:

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to

8. Possibly because the School District is not a party, it was never explained why its representatives even discussed conditions with pupils absenting themselves from school without permission in the public schools on a Friday morning, rather than scheduling a meeting for one of the several days when school is not in session.

promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection * * * Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations * * *

"We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech."

Again in Cox v. State of Louisiana, 379 U.S. 559, at p. 574, 85 S.Ct. 476, at p. 485, 13 L.Ed.2d 487 (1965), that court used this language:

"Nothing we have said here or in No. 24, ante, is to be interpreted as sanctioning riotous conduct in any form or demonstrations, however peaceful their conduct or commendable their motives, which conflict with properly drawn statutes and ordinances designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interests in private and public property, or protect the administration of justice and other essential governmental functions.

"Liberty can only be exercised in a system of law which safeguards order. We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations."

Because of the inaccurate statements by plaintiffs' counsel of the court's position in the "SUGGESTION" filed Jan. 19 in C.A. 44165 (Doc. 23 P. 1) [8a] and in the SUPPLEMENTAL MEMORANDUM OF LAW filed Jan. 23 in C.A. 44151 (Doc. 43, for example P. 6), it seems necessary to state that the law does not permit a citizen to secure an injunction in the federal court restraining a state's enforcement of a criminal statute where no exercise of First Amendment rights is involved. The citizen is required to vindicate his federal constitutional rights in the state courts first and, if their action is adverse, he may apply to the Supreme Court of the United States for review, as well as invoke Post-Conviction remedies, including a petition for a writ of habeas corpus, if necessary. See Stefanelli v. Minard, 342 U.S. 117, at p. 120, 72 S.Ct. 118, at p. 120, 96 L.Ed. 138 (1951) where the court said:

"The maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo-American law. It is impressively reinforced when not merely the relations between coordinate courts but between coordinate political authorities

---

**8a.** The Court made clear at N.T. 2065–2066 and 2068–2069 that it would be glad to consider post-hearing memoranda of law covering authorities not already presented to it if they were submitted within one week, which was the time suggested by counsel for plaintiffs (N.T. 2066). The record contains no "evident reluctance" suggested at page 1 of Doc. 23 in C.A. 44165 and the Court specifically mentioned one area in which it needed help (N.T. 2068–2069).

are in issue. The special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law, has been an historic concern of congressional enactment, see, e. g., 28 U.S.C. §§ 1341, 1342, 2283, 2284(5)."

Again in Dombrowski v. Pfister, 380 U.S. 479, at pp. 484–485, 85 S.Ct. 1116, at p. 1119, 14 L.Ed.2d 22 (1965) the court said:

"The Court has recognized that federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework. It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings."

On his own testimony (N.T. 1092 & 1112), Dozier Smith went to the School Administration Building on November 17 to cash or secure a check for back-pay and not to exercise his first amendment rights. He repeatedly said he did not even know where he was except that it was east of 21st St. (N.T. 1095), which was an area restricted by the police as not to be entered by the crowd, or where this building was (N.T. 1092–1093). Green and Johnson were on their way home (N.T. 1226, 1231 & 1236) and well over a half mile from the above Building when they were arrested as a result of an investigation of an incident several blocks from 21st & Winter Sts. The arrests were unrelated to their attending the demonstration a half-hour or more earlier in the day.

The court patiently heard many offers of proof and, out of an abundance of caution, much testimony relevant only to the Civil Rights claims plaintiffs have refused to press. The court showed no "reluctance" as claimed in the above mentioned Doc. 43 (Page 6) to hear testimony showing a pattern of unconstitutional prosecution action as opposed to police action in taking persons in custody for investigation or in making arrests followed by discharge without prosecution.

In making a distinction between the statutes considered in the Memorandum of Jan. 12 which do not abridge First Amendment rights, including free expression, on their face, and those considered below which on their face might conceivably be applied for such abridgement, the court relied on the cases cited on page 8 of that Memorandum.[8b]

Turning to the circumstances present between 11:45 a. m. and 1 p. m. on November 17 when the statutes discussed below were allegedly unconstitutionally applied, the evidence including testimony of at least one witness (Father Carpenter), produced by plaintiff makes clear that missiles were being, or had been, thrown at the police by the demonstrators at or after the time of the police decision to disperse the people south on 21st Street and West on Winter Street.[9] Some of the demonstrators had attacked the police in the process of resisting arrest prior to the time of the police order to disperse the crowd. A tumultuous crowd of people were present, some, who were arrested while committing violations of the law (N.T. 1772), were calling to others in the crowd to help them resist arrest (N.T. 348 & 1769, for examples). Aerials were ripped from cars (N.T. 369). The crowd had stopped cars on

---

**8b.** In City of Greenwood v. Peacock, 384 U.S. 808, 829, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966) the necessity of showing an effect on rights protected by the First Amendment in order to get federal court relief from possible state criminal court prosecutions was again emphasized. See Note, Bad Faith Prosecutions of Civil Rights Matters in State Courts—Future Developments of Subjunctive Relief in Federal Courts, 1 Ga.L.Rev. 656, 668–669 (1967).

**9.** The throwing back of the brick by the police into the crowd would appear to have been improper but not pertinent to the alleged constitutional application of the challenged statutes.

Winter and 21st Streets bringing traffic to a standstill (N.T. 345 & 356). When the crowd surrounded 3 policemen bringing an arrested, resisting demonstrator (Whitby) to a police van and attempted to interfere with the arresting officers, some police officials including the Commissioner went to the assistance of the arresting officers. This incident led to verbal taunts and threats to the police and the police were ordered to move west on Winter Street and then south on 21st Street to disperse the crowd (N.T. 339) by breaking it into small groups and then having the groups move south and west (N.T. 360 & 179). The police dispersed the crowd blocking 21st Street and Winter Street in about 15 minutes (12:34 to 12:50) See N.T. 337–8. As soon as the police moved to disperse the crowd, several missiles were thrown at them (testimony of Mrs. Gold).

The initial order to disperse the crowd was justified under the emergency circumstances existing at the time the action was taken in view of the situation which then confronted the police (an unrestrained group over about 3500 full grown, vigorous people without leadership committing some acts of vandalism and a few individuals taunting the police).[10] Also, it is noted that this demonstration had continued for several hours (and for approximately 1½ hours after the start of the negotiations which were the subject of the demonstration) when police action was taken. This forebearance by the police during a considerable period when the crowd was increasing in size (See D-3) and tension was mounting indicates that the police action was not taken in bad faith to "chill" the exercise of First Amendment rights.

The above testimony discloses that, once the arrest of Whitby occurred, the conduct of several of the demonstrators at 21st and Winter Streets was the "hard-core" behavior involving clear violations of the criminal law. See Feiner v. State of People of New York, 340 U.S. 15, 71 S.Ct. 303, 95 L.Ed. 295 (1951) and Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Also the arrests occurring during the dispersal of the demonstrators on November 17 were proper and did not amount to an expansion of the scope of the criminal statutes commented on below except insofar as Father Bevins and Mr. Traylor were charged with Assault and Battery on Policeman and Riot.[11] Appendices I & II,

10. The request by Mr. Holliday to have the police withdraw east to 20th Street in order not to arouse the crowd by a show of police force unfortunately came too late. Apparently, at the moment of such request, the Whitby incident was occurring and the order to dispurse the crowd took place as Whitby was brought to the corner of 21st and Winter Streets. Although there were more assaults on the police, brick and similar missile throwing, resisting arrest and taunting of the police after the order to disperse, there were some of these incidents (except, perhaps, missile throwing) prior to such order. Lieutenant Fencl had tried to calm the crowd (some of whom were standing on cars—see testimony of Mr. Hornbeck and Whitby incident) by asking the demonstrators to "cool it" over the bull-horn but without success. A flag of the United States had been taken from in front of the Boy Scout Building at 22nd and Winter Streets and only returned through action of a non-uniformed policeman (See testimony of Mr. Colgan). The students were being addressed by a battery operated bull-horn supplied by Mr. Mathis. Under all the circumstances, the orders of dispersal were justified.

11. The fact that two individuals are charged with violations of two statutes improperly where some legitimate criminal charges were placed against them is no basis for restraining the State law enforcement officials by injunction, especially where the District Attorney has not yet decided to submit any charges to the Grand Jury. It is also noted that there is no basis in the record for charging Dozier Smith with riot or conspiracy, and insufficient evidence to support all the charges against Green and Johnson. However, the record shows no pattern, as opposed to these isolated instances, of executive action in making arrests not justified by the wording of the Pennsylvania criminal statutes as interpreted by the appellate courts of that

attached hereto, contain the findings and some conclusions of the Court relevant to the arrests covered by the testimony produced at the hearings. Although there are several additional arrests shown on P–141 and P–142, the plaintiffs have not sustained their burden of showing any unconstitutional application of criminal statutes in making these arrests. It is noted that the District Attorney stipulated at N.T. 1903–1905 that all charges of truancy would be withdrawn as to students at the Benjamin Franklin High School and no charge of truancy against any other juvenile listed on P–142 would be pressed unless the student was a habitual truant on occasions other than November 17, 1967. We find that plaintiffs have not submitted any significant evidence that charges of truancy were placed by the police authorities in bad faith for the purpose of "chilling" the exercise of First Amendment rights.

Also it is noted as stated in footnote 11 above that no procedures whatever beyond the arrest have been taken in the case of the juveniles listed on P–142, which juveniles were released from custody on the late afternoon of November 17. The cases cited on page 3 of the A.C.L.U. Memorandum At The Close Of The Evidence involved defendants who had been not only prosecuted but convicted in the state courts. There is every reason to believe that juveniles such as Green and Johnson (also Smith if the district attorney has no more evidence than produced in this case) will not be prosecuted by the district attorney when this case has been terminated and he is at liberty to proceed with an investigation of those listed on P–142.

In view of the facts described above and Exhibits such as D-3, including the conduct of several of those arrested such as Mr. Mathis and Mr. Heard, a finding of "hard-core" activities on November 17 might be justified as noted above at P–

10. Under such circumstances, it can be contended that abstention is proper under decisions such as Cox v. State of Louisiana, 379 U.S. 536, 551, 85 S.Ct. 453 (1965) and Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 9 L.Ed. 2d 697 (1963) which carefully distinguish situations involving "hard-core" behavior. However, we believe that rulings on the constitutionality of the following Pennsylvania criminal statutes as "authoritatively" construed (cf. Dombrowski v. Pfister, 380 U.S. 479, 490, 85 S.Ct. 1116, (1965)) by the Pennsylvania appellate courts should be made by the Court both on the basis of the wording of such statutes as so construed and on the application of such statutes on this record:

## I. *CONSPIRACY TO DO UNLAWFUL ACT* (18 P.S. § 4302):

The Complaint states: the conspiracy act is unconstitutional in that it makes criminal a conspiracy to do a "malicious act" which is not a crime:

> Any two or more persons who falsely and maliciously conspire and agree to * * * do any other dishonest, *malicious*, or unlawful act to the prejudice of another, are guilty of conspiracy * * *. 18 P.S. § 4302. (Emphasis added.)

Plaintiffs maintain that even if there is agreement as to the definition of "malicious", the term cannot form the basis of a conspiracy; that the act sought to be accomplished must be criminal; and that a malicious act is not necessarily criminal.

■ "Malicious" is not an uncertain term in Pennsylvania. It has been defined as the intentional doing of a wrongful act without legal or social justification. Ramondo v. Pure Oil Company, 159 Pa.Super. 217, 48 A.2d 156 (1946).

■ Traditionally, where the act is lawful for an individual, it can be the

---

Commonwealth. There is no reason to suppose that the District Attorney will press prosecution on all the charges listed on p. 141 and p. 142 after the termination of this case permits him to proceed

with his investigation of these arrests. (See pp. 18–20 of hearing of November 30, 1967 before Judge John W. Lord, Jr.)

subject of a conspiracy when done in concert; but only where there is a direct intention that injury shall result from it, or where the object is to benefit the conspirators to the prejudice of the public or the oppression of individuals, and where such prejudice or oppression is the natural and necessary consequence. Commonwealth v. Mack, 111 Pa.Super. 494, 495, 170 A. 429 (1934).

Plaintiffs' position is that Pennsylvania is punishing mere agreement to do a lawful act in a lawful manner for malicious purposes. According to the statute (1) the agreement itself has to be false and malicious and (2) the act has to be both dishonest, malicious or unlawful and to the prejudice of another.

Mr. Justice Holmes, in Aikens v. State of Wisconsin, 195 U.S. 194, 195, 25 S.Ct. 3, 49 L.Ed. 154 (1904), indicated that a statute making it a crime to conspire to commit an act that is "maliciously injuring" to another is not constitutionally infirm since malicious mischief is a familiar and proper subject for legislative repression. He wrote:

> We interpret "maliciously injuring" to import doing a harm malevolently, for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired. Id. at 203, 25 S.Ct. at 5.

■ The Pennsylvania "Conspiracy" statute is neither void for vagueness nor overbroad.

## II. RIOTS, ROUTS, ASSEMBLIES AND AFFRAYS (18 P.S. § 4401):

The Pennsylvania Riot Statute, 18 P.S. § 4401, provides that:

> Whoever participates in any riot, rout, unlawful assembly or affray, is guilty of a misdemeanor, * * *.

The statute does not define the terms "riot", "rout", "unlawful assembly" or "affray". Plaintiffs contend that this absence of statutory definition renders the statute constitutionally infirm as being void for vagueness, relying on the United States Supreme Court decision in Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Thompson had been convicted under a Louisville disorderly conduct ordinance which failed to define the term "disorderly". Plaintiffs' reliance on this case is confusing, as no void for vagueness matter was discussed by the Supreme Court. Rather, the reversal of the conviction was placed upon due process grounds, as the record below was " * * entirely lacking in evidence to support any of the charges." Id. at 204, 80 S.Ct. at 628.

While plaintiffs' observation that the Pennsylvania Riot Statute does not define the terms "riot", "rout", "unlawful assembly" or "affray", cannot be challenged, this court cannot conclude that these terms were idly chosen and are so lacking in precision that the statute is constitutionally void for vagueness. All four terms are of unquestioned common law origin and are fully defined and discussed in the initial pages of Blackstone's treatment of "Offenses Against the Public Peace". 4 Blackstone, Commentaries * 145–46. The Pennsylvania appellate courts have defined the term "riot", as employed within section 4401 of the Penal Code, with express reference to the definitions that term has had at common law. See, e. g., Commonwealth v. Kahn, 116 Pa.Super. 28, 31, 176 A. 242 (1935); Commonwealth v. Abney, 195 Pa.Super. 317, 321, 171 A.2d 595 (1961). Accord, Commonwealth v. Hayes, 205 Pa.Super. 338, 340, 209 A.2d 38 (1965). For example, in Commonwealth v. Abney, supra, "riot" has been defined in the following manner (195 Pa.Super. at 321, 171 A.2d at 597):

> The Act of June 24, 1939, P.L. 872, § 401, 18 P.S. § 4401, provides that "Whosoever participates in any riot, rout, unlawful assembly or affray, is guilty of a misdemeanor * * *" As the statute does not define riot, we must look to the common law for the elements of the offense. Blackstone says, "A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel; as if they beat a man

**740**

* * * or do any other unlawful act with force and violence, or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner." Book IV, p. 146.

" 'A riot is commonly defined as a tumultuous disturbance of the peace by three or more persons assembled and acting with a common intent; either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner.' " Commonwealth v. Kahn, 1935, 116 Pa.Superior Ct. 28, 31, 176 A. 242, 243. See 77 C.J.S. Riot § 1.

 The Pennsylvania Superior Court, in the above excerpt, states that "[a]s the [riot] statute does not define riot, we must look to the common law for the elements of the offense." The principal authority cited was Blackstone. This practice adopted by the Pennsylvania courts, of defining common-law terms not otherwise defined in a statute by referring to an established meaning at common-law, not only imparts to these terms an acceptable precision, it is a method of statutory construction that has been fully accepted by the United States Supreme Court. In United States v. Turley, 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430 (1957), the Supreme Court commented:

We recognize that where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning.

Accord, United States v. Nedley, 255 F.2d 350, 357 (3rd Cir. 1958). Although the Pennsylvania courts have not defined the terms "rout", "unlawful assembly" or "affray", these terms are capable of quite precise definition at common-law. Furthermore, there is nothing that would lead this court to conclude that these terms would be given (or could be given) any definition by any Pennsylvania court other than these common-law definitions.

For example, the term "affray" is defined at common-law and in modern sources in *identical* terms: " * * * the fighting of two or more persons in some public place, to the terror of his majesty's subjects" at common-law and " * * * the fighting of two or more persons in some public place to the terror of the people" in contemporary terms. 4 Blackstone, Commentaries * 145, Black's Law Dictionary 83 (4th ed. 1951). The terms "rout" and "unlawful assembly" are susceptible of like definition, in a similar manner. "Rout" and "unlawful assembly" are treated in both common-law sources and modern sources as concepts interrelated with the concept of "riot". These terms are defined in Black's Law Dictionary, at 1705, in the following language:

*Unlawful Assembly.* At common law. The meeting together of three or more persons, to the disturbance of the public peace, and with the intention of co-operating in the forcible and violent execution of some unlawful enterprise. If they take steps towards the performance of their purpose, it becomes a *rout;* and, if they put their design into actual execution, it is a *riot.* 4 B. Comm 146. To constitute offense it must appear that there was common intent of persons assembled to attain purpose, whether lawful or unlawful, by commission of acts of intimidation and disorder likely to produce danger to peace of neighborhood, and actually tending to inspire courageous persons with well-grounded fear of serious breaches of public peace.

 Both the close interrelation of these terms at common-law, and the complete willingness of the Pennsylvania courts to give common-law meanings to the common-law terms employed in Pennsylvania penal statutes lead this court to conclude that the attack on the Pennsylvania Riot Statute as being void for vagueness is groundless. It is interesting to note that the use of common-law definitions to define common-law terms otherwise undefined by the legislature

already has been employed by the Pennsylvania appellate courts in defining the term "riot" as that term is employed in section 4401, the very section challenged by the plaintiffs. Any attempt by this court to conclude that this acceptable method of statutory construction would be abandoned in defining the remaining terms of section 4401 would be illogical. The terms themselves, (that is the definitions of "rout", "unlawful assembly" and "affray") have been precisely and uniformly defined both at common-law and in modern times. There is no basis for this court to conclude that these terms are void for vagueness. As a consequence, plaintiffs' attack on the Pennsylvania Riot Statute on such grounds is devoid of merit.

### III. DISORDERLY CONDUCT (18 P.S. § 4406):

The Pennsylvania "Disorderly Conduct" statute provides:

> Whoever wilfully makes or causes to be made any loud, boisterous and unseemly noise or disturbance to the annoyance of the peaceable residents nearby, or near to any public highway, road, street, lane, alley, park, square, or common, whereby the public peace is broken or disturbed or the travelling public annoyed, is guilty of the offense of disorderly conduct * * *. 18 P.S. § 4406.

 The Pennsylvania Statutory Construction Act, 46 P.S. § 558(1) provides that penal statutes be strictly construed so as not to be enlarged in scope by the courts. With this in mind, the Pennsylvania courts have applied the "Disorderly Conduct" statute to situations involving loud, boisterous *and unseemly* noise or disturbance. *All three elements have to be present* to constitute the prohibited noise or disturbance. See, Commonwealth v. Greene, 410 Pa. 111, 189 A.2d 141 (1963). Also under 46 P.S. § 558(1), wilfulness and disturbance of the described residents, the travelling public, or persons near the public places mentioned are elements of the crime.

 Unseemly means not fitting or proper in respect to the conventional standards of organized society or a legally constituted community. Id. at 113, 189 A.2d 141. It appears to this court that the term "unseemly" is analogous to the oft-used term "unreasonable". Certainly it is no more vague. Just as certain conduct constitutes a civil or criminal wrong if done in an "unreasonable" manner, so it must be recognized that unseemliness giving rise to disorderly conduct culpability depends on the surrounding circumstances. Thus, shouting fire in a public library may be unseemly if indeed there is no fire, but if a fire did exist then the noise would be justified and not unseemly. Indeed, perhaps the ultimate issue is one of justification; for people do have the right not to be annoyed or disturbed without justification. See, United States v. Woodard, 376 F.2d 136 (7th Cir. 1967).

 While the emphasis of the offense centers around the unseemliness of the actor's conduct, it must be re-emphasized that the unseemly conduct must be both loud and boisterous. The test of loudness and boisterousness is not uncertain. The noise must be sufficiently loud and boisterous to annoy the adjacent *reasonable* man. Thus noise, no matter how unseemly, that is not of such volume and decibelity as to annoy a nearby reasonable, peaceable man cannot form the basis of disorderly conduct. For example, the firing of a gun by a *lone* individual on the desert is without culpability while the same conduct in a public library would be blameworthy. For the above-mentioned reasons the terms "loud" and "boisterous" are not vague. The Disorderly Conduct Act is constitutional.

### IV. CORRUPTING THE MORALS OF A MINOR (18 P.S. § 4532):

Any possible vagueness in the "Corrupting the Morals of a Minor" statute, 18 P.S. § 4532, would have to stem from the term "morals". It is argued that "morals" is such a vague word as to void the statute. At first glance this might

appear to be a sound position. However, a review of the landmark Pennsylvania case interpreting the statute, Commonwealth v. Randall, 183 Pa.Super. 603, 133 A.2d 276 (1957), cert. denied 355 U.S. 954, 78 S.Ct. 539, 2 L.Ed.2d 530 (1958), indicates that the Pennsylvania appellate courts have adopted the standard of "moral turpitude" applied for many years by the federal courts in deportation proceedings. While the "void for vagueness" doctrine has as its purpose the warning of individuals of the *criminal* consequences of their conduct and is thus generally only applied as to *criminal* statutes, the Supreme Court of the United States ruled that in light of the gravity of deportation, it would test the term "moral turpitude" under the established criteria of "the void for vagueness" doctrine. Jordan v. De-George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1950). The Court stated that the phrase "moral turpitude" presented *"no greater uncertainty or difficulty than* language found in many other statutes repeatedly sanctioned by the court." Id. at 231, 71 S.Ct. at 708 n. 15.

 Similarly, *it was stated in Judge* Ervin's opinion in the *Randall* case that the term "good moral character" as used in the immigration and naturalization laws has frequently been upheld by the federal courts. See, Estrin v. United States, 80 F.2d 105 (2nd Cir. 1935). The Second Circuit Court of Appeals talked in terms of the "generally accepted moral standards of the community" and "common standards of morality." The Pennsylvania Superior Court in *Randall* concluded that the "Corrupting the Morals of a Minor" statute was sufficiently clear

and definite to meet the test of constitutionality. We agree in view of the above interpretation of this statute by the Pennsylvania courts.

## V. BREACH OF THE PEACE
(18 P.S. § 5101):

 It is conceded that Pennsylvania has no statutory offense known as breach of the peace. But the Pennsylvania Penal Code contains a provision whereby all common law offenses, in the absence of statutory provisions abolishing them, are still crimes in Pennsylvania and may be prosecuted as a common law offense, notwithstanding the fact that there is no express reference to such an offense in the Penal Code itself.[A] If the offense charged was indictable under that portion of the common law of England which has been adopted in Pennsylvania, in the absence of a statutory provision abrogating the offense, it is preserved by that section described by the codifiers as "a saving section". Commonwealth v. Mohn, 52 Pa. 243, 246 (1866); Commonwealth v. McHale, 97 Pa. 397, 407 (1881); Commonwealth v. DeGeorge, 97 Pa. Super. 181, 185 (1929).

 The offense known as breach of the peace is of common law origin and embraces a great variety of conduct disturbing or menacing the public order or tranquility. It includes not only an actual breach of the peace, but also acts or conduct which tends to incite others to disturb the peace. 4 Blackstone Commentaries *142; Commonwealth v. Taylor, 5 Bin. 277, 281 (1812). It is not the name of any single charge or crime, but includes all violations of the public peace or order or decorum.[B]

A. 18 P.S. § 5101. *"Common law and other offenses preserved.* Every offense now punishable either by the statute or common law of this Commonwealth and not specifically provided for by this act, shall continue to be an offense punishable as heretofore. 1939, June 24, P.L. 872, § 1101."

B. Plaintiffs argue that Article IV of the Pennsylvania Penal Code, 18 P.S. §§ 4401–4419, dealing with offenses against

the public peace, is so comprehensive that common law breach of the peace has been abrogated in Pennsylvania. 18 P.S. § 5104; Commonwealth v. Bausewine, 156 Pa.Super. 535, 541, 40 A.2d 919 (1944). Specifically, they contend that in addition to the specific acts contained in Article IV, the Penal Code also provides for a "catchall" crime under the name of "disorderly conduct", 18 P.S. § 4406, to punish all types of conduct tending to a breach of the peace not otherwise speci-

Breach of the peace has been defined as "acts injurious to private persons, which tend to excite violent resentment, and thus produce fighting and disturbance of the peace of society." Commonwealth v. Taylor, supra, 5 Bin. at 281. In United States v. Kessler, 213 F.2d 53, 56 (3rd Cir. 1954), Senior Judge Biggs (then Chief Judge) used this language defining this crime: "A breach of the peace is 'a disturbance of public order by an act of violence, or by an act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community.' "

 We are well aware that vague criminal laws suffer a constitutional infirmity and cannot be tolerated. Where a conviction is "based on a common law concept of the most general and undefined nature" there is left to the "executive and judicial branches too wide a discretion in its application." Cantwell v. State of Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940). However, this court respects, as it must, the interest of the State in maintaining peace and order. Pursuant to this interest, it is constitutionally permissible for a State to preserve the common law offense of breach of the peace in general terms where it relates "the offense to the already developed body of common law defining that crime." Garner v. State of Louisiana, 368 U.S. 157, at 202, 82 S.Ct. 248, at 272, 7 L.Ed.2d 207 (1961), concurring opinion of Harlan, J. In so relating the offense of breach of the peace, the Pennsylvania courts have given an otherwise vague prohibition adequate constitutional definition as construed above by the U. S. Court of Appeals for the Third Circuit in United States v. Kessler, supra, and by the

Pennsylvania appellate courts in the above decisions. See, also, cases cited at pages 2 and 3 of the District Attorney's Memorandum of January 23, 1968 (Dec. 45).

## VI. *INCITING TO RIOT* (18 P.S. § 5101):

Inciting to riot, in Pennsylvania, is a common-law offense, included within the Pennsylvania Penal Code scheme by virtue of the so-called "saving clause". 18 P.S. § 5101.

 "Inciting to riot", challenged by plaintiffs as being void for vagueness and thus, constitutionally infirm, has been defined by the Pennsylvania appellate courts, in the following terms:

Inciting to riot, from the very sense of the language used, means such a course of conduct, by the use of words, signs or language, or any other means by which one can be urged on to action, as would naturally lead, or urge other men to engage in or enter upon conduct which, if completed, would make a riot. If any man or set of men should combine and arrange to so agitate the community to such a pitch, that the natural, and to be expected results of such agitation, would be a riot, that, would be inciting to riot, * * *.

Commonwealth v. Merrick, 65 Pa.Super. 482, 491 (1917); Commonwealth v. Albert, 169 Pa.Super. 318, 321–322, 82 A.2d 695 (1951).

Plaintiffs have not had " * * * the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot * * *." Cantwell v. State of Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905 (1940). Accord, Edwards v. South Carolina, 372 U.S. 229, 236, 83

---

fied. However, the common law is not to be considered abrogated by statute unless the legislative intent to do so is plainly or clearly manifested, and any such abrogation will not be considered effected to a greater extent than the unmistakable import of the language used. 18 P.S. § 5104. Plaintiffs have not produced any Pennsylvania cases, nor has our in-

dependent research disclosed any, which indicate that the common law offense of breach of the peace has been abrogated in Pennsylvania. Indeed, the Pennsylvania cases, and our own Third Circuit, appear to indicate to the contrary. Commonwealth v. Taylor, 5 Bin. 277; United States v. Kessler, 213 F.2d 53, 56 (3rd Cir. 1954).

S.Ct. 680, 9 L.Ed.2d 697 (1963). Instead, plaintiffs have contended that the Pennsylvania definition of "inciting to riot" is void for vagueness. Their position is untenable. Pennsylvania appellate court definitions of "inciting to riot" limit the range of proscribed conduct to factual situations where "the expected results of such agitation" would be a riot. This court should not attempt to hypothesize situations beyond the range of this narrowed definition, uniformly imposed by the Pennsylvania courts, in an attempt to demonstrate that such hypothetical situations might indicate that the common-law crime of inciting to riot is vague. The Pennsylvania courts, in their defining "inciting to riot" have defined the crime in understandable terms. Cf., Ashton v. Kentucky, 384 U.S. 195, 198, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). The phrase, "inciting to riot" is not void for vagueness in light of the narrowed definition given by the Pennsylvania courts.

As noted above at page 3, plaintiffs have not filed on or before January 23, 1968 additional civil actions or amendments to the complaints as specifically permitted by the January 9, 1968 order, as amended on January 19, 1968, so that the dismissal of the portions of the complaint specified in the January 9, 1968 order is effective.

For the foregoing reasons, judgment will be entered for the defendants and against the plaintiffs.

### APPENDIX I

(Arrests of adults listed on P. 141 covered by testimony.)

*Arrest of Father Bevins.*

 We are not persuaded, and do not find, that Father Bevins intentionally placed himself on any police officer or Mr. Traylor on November 17. He requested the police not to use their clubs and specifically asked them not to beat a girl being placed under arrest. He criticized the police for starting the mob scene (See testimony of Rev. Nichols, and Rev. Woodruff as well as that of Father Bevins, Mr. Traylor, Officer Tiano and Lt. Giordano). However, we do find that Father Bevins unintentionally interfered with the police officer during an arrest in an attempt to protect a girl being arrested and the police were justified in removing him by arrest from the mob scene so that the assigned job of dispersing the demonstrators south on 21st Street could proceed. The effect of the actions of Father Bevins was to divert the police and to enable the girl to escape.

We consider it highly probable that prosecution against Father Bevins will not be pressed but, if it should be, there is no reason to believe that the state courts will deny him any of his constitutional rights. An offer of testimony indicates that all charges were subsequently dropped against another arrested demonstrator on another occasion.

*Arrest of L. W. Cameron.*

Mr. Cameron conceded that he was requested to move south on 21st Street and that he elected to disobey the request and go east on Race Street when the police line was south of Cherry Street. The decision to move the crowd south on 21st Street was within the discretion of the police under the circumstances. When first asked to move south, he called to the crowd "Don't run. These people can't tell you what to do." When arrested, he called to the crowd "See what these cops are doing. They can't lock all of you up, so they are going to lock me up."

*Arrest of Albert Hampton on 11/17/67.*

After Mr. Hampton had been advised by a police officer that he was not permitted to go thru a police line across 21st Street at the north side of Winter Street, he said "(obscenity) you cops, I am coming through," struck the officer who was in the police line with his fist, "spit" on him and proceeded thru the line (N.T. 1768). After he had passed thru the line and was about 3 feet beyond it, he was placed under arrest at which time he called to the crowd: "Riot, riot. Don't let them take me away." (N.T. 1769). Miss Jay testified that he was hit by the police at 21st and Winter Street (N.T.

2055) and Mr. Holliday placed him near that intersection. Miss Wilson and Mr. Morris (N.T. 2051 and 2061) said he was seized by the police at a different location. Two officers were required to take Mr. Hampton to the police van because of his struggles (N.T. 1769). Mr. Hampton conceded that he had called preliminary meetings and helped to organize the demonstration in order to remedy the grievances on P. 2.

*Arrest of David Richardson.*

The record does not show in any detail the reasons for this arrest or just when it took place. However, the testimony of Mr. Robinson (N.T. 236) indicates that Richardson's activities in protecting a young woman enabled her to escape from the police who were pursuing her, quite probably in an effort to arrest her, so that the record does not show enough to conclude that these Pennsylvania criminal statutes were being unconstitutionally applied in his arrest.

*Arrest of Mr. Hinrichs on November 13, 1967 at Bok Technical School.*

Mr. Hinrichs and several others persisted in advising, in a loud voice, students entering this school shortly after 8 A.M. on November 13, not to go into the school if they were members of the Black Student Assn., after he was warned by the police officers that he was to stop interfering with students going into the school on this regular school day. He was arrested on charges of disorderly conduct and breach of the peace.

*Arrest of Mr. Mathis on November 17, 1967.*

When the crowd was ordered to disperse by moving west on Winter Street, Mr. Mathis, who appeared to be the leader of the group, refused to move and, in a loud voice, told other members of the crowd not to move (N.T. 1796 and 1806). He was given a second warning to disperse and refused to do so. He was then taken into custody (N.T. 1797). He resisted going with the officers to the police van and had to be taken by force to the van (N.T. 1797). Also, force had to be used to put him into the van

(N.T. 1798). In view of this conduct, the charges placed against him as shown in the exhibits are not unconstitutional applications of the statutes.

*Charge against Mr. Mathis for events of April 21, 1967 (N.T. 1817 ff).*

On this date, a police detail under Lt. Fencl was at the William Penn Girls High School due to the request of the principal. Some girls started to throw dishes and cutlery in the cafeteria and in the corridors and finally pulled the fire alarm. The principal ordered all the students to leave the school building and announced that school would be dismissed for the balance of the day. One to two hundred unruly students gathered on the street at the school entrance near 15th and Mt. Vernon Streets. The police officer stationed there told the students not to go back in the school. Mr. Mathis said to the students at least twice "You don't have to listen to the police. Go back into the school." About 50 of the students pushed past the police officer and went back into the school. Mr. Mathis was charged with violation of 18 P.S. 4532 (Corrupting the Morals of a Minor). He was also charged with inciting to riot and disorderly conduct. There is not sufficient evidence concerning the events of April 17 and other days preceding April 21 to permit a finding that the conspiracy statute was applied in an unconstitutional manner. The inaccurate character of Mr. Mathis' testimony is illustrated by his statement at N.T. 1325 that he did not speak to the students at Edison and Gratz High School and his testimony at N.T. 1328 "I did speak there, definitely, yes" (see, also N.T. 1339). These charges were not an overbroad application of the statutes.

*Arrest of Mr. Traylor.*

We are not persuaded, and do not find, that Mr. Traylor placed himself intentionally on any police officer on November 17. He requested the police officers to release a girl whom they were in the process of arresting with good cause. We find that Mr. Traylor interfered unintentionally with the police officers dur-

ing an arrest in an attempt to protect a girl being arrested and the police were justified in removing him by arrest from the mob scene as has been stated above in the case of Father Bevins. (See testimony referred to above under Father Bevins).

Unlike Father Bevins, it was testified that Mr. Traylor called to the crowd when he was being taken to the police van saying "See what they are trying to do. They are trying to lock me up." Apparently attempts were made to free him by the crowd as a result of these statements, according to the testimony of Officer Gallagher. However, Officer Gallagher testified that Mr. Cameron used almost the same language and he may have inadvertently attributed Mr. Cameron's statements to Mr. Traylor. Also there were many witnesses such as Rev. Woodruff who testified that the protection of the girl by Father Bevins was at a different time than the similar action by Mr. Traylor.

It is noted that Mr. Traylor, unlike witnesses such as Mr. Mathis who came to this community within the past 8 years and has received at least indirectly finances from organizing associations of negroes of which he is an official, has no financial interest in demonstrations such as that on November 17, but takes part in them principally for altruistic reasons.

If there is any prosecution pressed against Mr. Traylor, there is no reason to believe that the state courts will deny him any of his constitutional rights.

APPENDIX II

(Certain juveniles arrested on November 16 and 17 listed on P.-142 as covered by testimony)

ARREST OF KENNETH HEARD, ON NOVEMBER 16 AT ABOUT 2:15 A.M., AND ON NOVEMBER 17, 1968.

We find that the testimony of officers Feldman and Mims was straightforward and credible. We reject the testimony of Kenneth Heard that he did not strike Officer Feldman. There was no uncon-stitutional application of the above discussed statutes in this arrest on November 16.

As to the arrest on November 17, Kenneth Heard conceded that he might have struck an officer before he assumed a squatting, non-violent position as the police came toward him. He also conceded that he had called to the policemen on November 17 on a bull-horn that the student committee "demand that you withdraw."

ARREST OF ANTHONY WAYNE GREEN AND DAVID JOHNSON ON NOVEMBER 17.

These juveniles were arrested about 1 P.M., while running in a group of 5 or 6 boys near 13th and Arch Streets by Detective DeCree while he was investigating a report of a shooting at 16th and Arch Streets by colored males. During questioning, the boys stated they had been to the demonstration at the School Administration Building in order to avoid going to school (Benjamin Franklin High School). Detective DeCree took them to the Police Administration Building at 8th and Race Streets for investigation and the charges listed on P. 142 were placed against them at that Building (See D5 and testimony of Sergeant De-Benedetto).

ARREST OF DOZIER SMITH

This juvenile testified that he had proceeded down 21st Street, east of Winter at a time when other witnesses had testified that the public had been instructed to move west on Winter Street and a police guard had been placed on the east side of 21st Street at Winter Street. His presence north of the Fels Planetarium entrance to the Franklin Institute amounted to a violation of the police directive to the demonstrators to remain west of 21st Street, so that his arrest cannot be considered unreasonable. From his testimony, his presence there was not an intentional violation of the law and the charges against him, except for Disorderly Conduct, are unjustified. The officer who arrested him was not

called to the stand, but we have no reason to believe that the other charges against him will be pressed or that the Pennsylvania Courts will deny him his constitutional rights.